## AMERICAN NATIONAL BUILDING & LOAN ASSOCIATION et al. *v.* MAYOR AND CITY COUNCIL OF BALTIMORE, et al.

[No. 460, September Term, 1965.]

24

26

*Decided December 15, 1966.*

*Motion for rehearing filed January 10, 1967, opinion modified February 9, 1967.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, OPPENHEIMER and FINAN, JJ.

*George Cochran Doub,* with whom were *Robert F. Skutch, Jr., Jacob B. Davis, William H. Holden, Jr.* and *Weinberg & Green* on the brief, for American National Building & Loan Association, Inc., et al., part of appellants; *Robert M. Thomas* and *Francis D. Murnaghan, Jr.,* with whom were *V. Charles Rinaudo* and *Joseph W. Mosmiller* on the brief, for Loyola Federal Savings & Loan Association, other appellant.

*Ambrose T. Hartman, Deputy City Solicitor* and *Nelson B. Seidman, Assistant City Solicitor,* with whom were *Joseph Allen, City Solicitor* and *Herbert J. Belgrad, Assistant City Solicitor* on the brief, for appellees.

HORNEY, J., delivered the opinion of the Court.

These are appeals by one hundred and sixty federal and state savings and loan associations from an order of the Circuit Court of Baltimore City sustaining without leave to amend the demurrers to the bills of complaint challenging the validity of Ordinance 428 passed by the City Council of Baltimore and approved by the Mayor on December 30, 1964. Although the City evidently intended to impose an annual tax on all savings and loan associations having a place of business in the City, the applicability of the tax did not extend beyond the year 1965 because the enactment of Chapter 183 of the Laws of 1965 (amending § 128 of Article 81 of the Code so as to impose a state tax on the earnings of savings and loan associations as mutual savings banks had theretofore been taxed) had the effect of superseding the ordinance.

The tax was imposed on state and federal savings and loan associations "for the privilege of doing business and carrying on operations in the City of Baltimore" to the extent that the business of each was "derived from or fairly allocable" to the City. The tax was calculated at the rate of 10 cents per $100 [1] on the amount of money invested or deposited in each association as of December 31st of the preceding year. So much of the business of an association that maintained places of business both in and out of the City was to be determined, where prac-

---

1. The rate of the tax was the same as the state graduated franchise tax then levied by the State on deposits of mutual savings banks by Chapter 783 of the Laws of 1953. Initially, the rate was 22 cents per $100 but was reduced until it reached 10 cents per $100 on January 1, 1957. Prior to January 1, 1954, the rate of the franchise tax had been ¼ of 1%. Chapter 783 (§ 128 of Article 81) was repealed by the enactment of Chapter 183 of the Laws of 1965 imposing a state franchise tax of ¾ of 1% on the net earnings of mutual savings banks and building, saving and loan associations.

ticable, by separate accounting to establish what portion of the aggregate amount of money was invested or deposited in the City, but where a separate accounting was not practicable, the taxable portion was to be determined by rules and regulations promulgated by the city treasurer in accordance with the criteria set forth in the ordinance. And the severability clause provided that a judicial determination that any part of the ordinance was invalid should not affect the remaining parts of the ordinance. The total taxes collected in 1965 under the ordinance, in the approximate sum of $800,000, is held in escrow pending the outcome of this litigation.

Of the institutions involved, some were federally chartered under the Home Owners' Loan Act of 1933, 12 U. S. C. A. 1461-1468, as amended. These institutions are members of the Federal Home Loan Bank System and the Federal Savings and Loan Insurance Corporation. The other savings and loan institutions are state chartered and are regulated by the provisions of §§ 144-161LL of Article 23 of the Code (Cum. Sup. 1966) and their deposits are insurable by the Maryland Savings-Share Corporation.

In attacking the imposition of the tax, the appellants contend in effect: (i) that the State, by the enactment of Chapter 205 of the Laws of 1961 (now codified as §§ 161A-161KK of Article 23 of the Code) imposing a state franchise tax and providing for the regulation of savings and loan associations, preempted the power of the City to impose a tax for the privilege of doing business within its confines; (ii) that the tax was invalid in that it was levied (a) on intangible personal property and (b) on securities of the United States; (iii) that the ordinance violates due process under the Federal Constitution and the "law of the land" clause of the State Constitution in that it failed to define the measure of the tax and is vague as to the territory encompassed; (iv) that the ordinance is void in that it improperly delegated legislative authority to the city treasurer; and (v) that the failure of the ordinance to subject mutual savings banks to the tax was a violation of the provisions of 12 U. S. C. A. 1464(h) prohibiting discrimination against savings and loan associations.

(i)

The claim that the City lacked power to impose the tax because the State had preempted the field is clearly without merit. The basic power of the City to enact the ordinance is set forth in § 6 and subsection (16) of the Baltimore City Charter providing:

> "6. The Mayor and City Council of Baltimore shall have full power and authority to exercise all of the powers heretofore or hereafter granted to it by the Constitution of Maryland or by any Public General or Public Local Law of the State of Maryland; and in particular, without limitation upon the foregoing, shall have power by ordinance, or such other method as may be provided in its Charter, subject to the provisions of said Constitution and Public General Laws:
>
>         * * *
>
> "(16) Licenses
> "To license, tax and regulate all businesses, trades, vocations or professions; * * *."

In *McBriety v. Baltimore*, 219 Md. 223, 148 A. 2d 408 (1959), where we had occasion to discuss the taxing power of the City, it was said at p. 231:

> "There is no room for doubt that under this broad and comprehensive grant of charter powers the City has full power and authority not only to *license* for regulatory purposes but also to *tax* for revenue purposes * * * unless * * * the ordinance [exercising the power and authority] * * * is unconstitutional or illegal."

In addition, while the power of the City to tax is broad, we think it is significant that when the charter was amended to limit the power of the City to tax intangible personal property and certain other taxable sources (enumerated in subsection 33½ of § 6 of the charter) the amendment did not preclude a tax on savings and loan associations.

As authority for the proposition that the State had preempted the field, the appellants cite a line of cases, such as *Gaither v.*

*Jackson,* 147 Md. 655, 128 Atl. 769 (1925) and *Dasch v. Jackson,* 170 Md. 251, 183 Atl. 534 (1936), in which certain city imposed taxes were declared to be invalid, but the cases are distinguishable. In *Gaither,* a city tax on auctioneers was struck down because the ordinance undertook to repeal a law providing for the payment by city auctioneers of a license fee to the State. The tax here had no such effect and in no way infringed upon the provisions of any state law. In *Dasch,* the tax was invalidated because, besides being an arbitrary display of police power, it was not necessary for the public health and safety. Clearly, the situation here is in no way comparable to the situation there.

The appellants argue that the matter of regulating the savings and loan business is one of a general nature to be carried out by the State and that such regulations (codified as §§ 161-161LL of Article 23), being a general law and as such in conflict with the ordinance, the general law should prevail. As authority they cite *Heubeck v. City of Baltimore,* 205 Md. 203, 107 A. 2d 99 (1954) and *Baltimore City v. Stuyvesant,* 226 Md. 379, 174 A. 2d 153 (1961). In *Heubeck,* the city ordinance forbade the eviction of a tenant at the expiration of a lease when the State law permitted it. In *Stuyvesant,* the attempt of the city to license those engaged in the business of becoming sureties in criminal cases for compensation was in conflict with the state licensing law. These cases are distinguishable, however, because there were in those cases direct conflicts between the city and state laws. In the instant case, there is no such conflict. Rather than this being a case involving a *direct conflict,* the power to tax appears to be *concurrent.* On this point, the reasoning of Judge Prendergast is apposite:

> "It would appear that the tests of general laws was devised, not to draw an impermeable line between the authority of the City and the State, but rather merely to define the inclusive limits of the State's powers. 'General' under this test merely means that the subject is of sufficient statewide effect to give the State authority to legislate. It does not mean that it is not of sufficiently local effect to give the City at least concurrent power to legislate. The associations contend, in

> effect, that what is not a local law as far as the State is concerned cannot be a local law insofar as the City is concerned, i.e., that 'general' and 'local' are absolute terms and mutually exclusive. The Court of Appeals has never adopted this theory, but on the contrary, admitted in *Gaither* [*supra*] the possibility of concurrent power. Loyola [Federal Savings and Loan Association] recognizes this possibility and counters it with the unconvincing argument that for something to be treated by both City and State simultaneously, it must be capable of division on a reasonable basis (e.g. difference of condition) in order to support that difference in treatment. The associations contend that the non-localized character of the savings and loan associations does not come within the test. Therefore since the tax is general within this test devised for the State and cannot be made divisible, it cannot be local as being within the City's power to enact. This argument fails because, as the City Solicitor notes, the tax is imposed only on business within or fairly allocable to the City, and to that extent there is a reasonable basis for local taxing power, even if a similar tax by the State would be general and within the power of the Legislature."

The views of this Court on the existence of concurrent power to impose certain regulations are also expressed in *Billig v. State,* 157 Md. 185, 145 Atl. 492 (1929) and in *Rossberg v. State,* 111 Md. 394, 74 Atl. 581 (1909).

Since, according to § 161A of Article 23, the avowed purpose of the Savings and Loan Act of 1961, was to promote the security and stability of the savings and loan associations and thereby subserve an important public function, the final argument with respect to the first contention is that the ordinance passed by the City is contrary to this policy. Likewise, they contend that § 161HH of Article 23 requiring every association to pay an annual franchise tax, had the effect of precluding the City from assessing a similar tax on such associations. The City, on the other hand, in rejecting the claim that preemption existed, contends that the statute by providing for the

payment of a franchise tax "in addition to any other tax imposed by law" indicates the legislative intent not to preempt the field and refers, not only to taxes already in existence, but to future taxes as well. The City, claiming that the power to tax is concurrent, further contends that the two taxes are different in that the city tax was for revenue purposes and the state tax is solely regulatory.

We think that the Savings and Loan Act of 1961 imposing a State franchise tax was regulatory and did not preempt the power of the City to impose a privilege tax for revenue purposes. It is apparent that § 161HH, *supra,* was intended only to provide the operating expenses of the newly created Board of Building, Savings and Loan Association Commissioners. This is evidenced by the imposition of a minimal franchise tax of only one hundred seventy-five ten-thousandths of one per cent (175/10,000 of 1%) of the aggregate withdrawal value of the free shares purchased in Maryland as of the end of each year.

In *Maryland Theatrical Corporation v. Brennan,* 180 Md. 377, 24 A. 2d 911 (1942), our predecessors, in describing the test for determining whether a tax is primarily a revenue measure or is regulatory in nature, said at p. 381 :

> "The question whether a particular Act is primarily a revenue measure or a regulatory measure is important, because different rules of construction apply. A regulatory measure may produce revenue, but in such a case the amount must be reasonable and have some definite relation to the purpose of the Act. A revenue measure, on the other hand, may also provide for regulation, but if the raising of revenue is the primary purpose, the amount of the tax is not reviewable by the courts. There is no set rule by which it can be determined in which category a particular Act primarily belongs. In general, it may be said that when it appears from the Act itself that revenue is its main objective, and the amount of the tax supports that theory, the enactment is a revenue measure. 'In general, * * * where the fee is imposed for the purpose of reg-

ulation, and the statute requires compliance with certain conditions in addition to the payment of the prescribed sum, such sum is a license proper, imposed by virtue of the police power; but where it is exacted solely for revenue purposes and its payment give the right to carry on the business without any further conditions, it is a tax.' 33 Am.Jur., *Licenses,* [§ 19, p. 340]."

Applying this test, it is apparent that the State tax is regulatory in nature and that the City ordinance was enacted solely for revenue purposes. This conclusion is reinforced by the inclusion in § 161HH of a clause providing that "any other tax imposed by law" would be valid regardless of when the tax became effective. The same conclusion was reached in *Austin v. Seattle,* 30 P. 2d 646 (Wash. 1934), where an almost identical clause as that included in § 161HH was held not to have hampered the imposition of a local tax in the same area as was taxed by the State.

Finally, although the legislature, by the enactment of § 128 of Article 81 of the Code of 1957 requiring the payment of a franchise tax on deposits of mutual savings banks, had partially preempted the area, we conclude that the intent of the legislature not to preempt the entire area in 1961 (when it undertook to regulate the building, savings and loan and homestead business and imposed a minimal franchise tax to pay the cost thereof) is demonstrated by its having wholly preempted the area in 1965 (when it imposed a franchise tax on the net earnings of all mutual savings banks and building, saving and loan associations).

(ii *a* and *b*)

The appellants also contend that the City tax is invalid in that it is a tax on intangible personal property rather than a privilege tax and, as such, is prohibited by the provisions of subsection 33½ of § 6 of the City Charter. In support of this contention they point out certain similarities between the tax imposed and a property tax. They advance several arguments. First, they claim that the tax is measured by the value of property and that this makes it a property tax. They say that it is

determined as of a particular day each year as is a property tax. They point out that the penalty for nonpayment, being the imposition of a lien on the deposits, is a property tax remedy. Finally, they insist that its purpose, being that of revenue producing, classifies it as a property tax.

While there is authority to support the proposition that a tax measured by the value of property is a tax on such property, the overwhelming weight of authority, in a case like this, is to the contrary. The cases are collected in an annotation in 103 A.L.R. 18. The Maryland cases are in line with the holdings of the majority of courts elsewhere. In *Rohr v. Gray,* 80 Md. 274, 30 Atl. 632 (1894), it was held that the requirement of a license for each of several places of business measured by the amount of merchandise kept on hand was not a property tax but was a license tax. A tax on all persons engaged in the business of packing or canning oysters was upheld as a valid privilege tax even though it was measured by the quantity of oysters packed in *State v. Applegarth,* 81 Md. 293, 31 Atl. 961 (1895). Also see *State v. Shapiro,* 131 Md. 168, 101 Atl. 703 (1917); *Maryland Racing Commission v. Maryland Jockey Club,* 176 Md. 82, 4 A. 2d 124 (1939); and *Herman v. M. & C. C. of Baltimore,* 189 Md. 191, 55 A. 2d 491 (1947). These cases make it apparent that the fact that taxes are measured by the amount or quantity of the property taxed does not mean that the tax is classifiable as a property tax. On the contrary, we think it is obvious that the tax in question is a privilege tax. The funds involved are subject to the tax only because they are on deposit in the taxed institutions; once withdrawn they are no longer subject to the tax. The other characteristics of this "privilege tax" as it was legislatively labeled, although similar to those of a property tax, are, like the funds on deposit, also inconclusive. And while the legislative label is not conclusive either, the designation is nevertheless "entitled to much weight." *Anne Arundel County v. English,* 182 Md. 514, 35 A. 2d 135 (1943).

Since the tax involved is not a tax on property, the contention that the tax is invalid because it taxes the securities of the United States, which constitute a part of the investment portfolios of the associations, is also not sustainable. The tax

was for the privilege of doing business in Baltimore City and was not on the investments held by the associations. For this reason no federal securities were taxed. See *Werner Machine Co. v. Director*, 350 U. S. 492 (1956) ; *Flint v. Stone Tracey Co.*, 220 U. S. 107 (1911) ; *Society for Savings v. Coite*, 73 U. S. 594 (1868).

(iii)

The tax was assailed for violating the federal and state constitutions as to the territories it encompassed. As far as the associations having no offices outside of the City is concerned the tax is assailed for being on capital to be invested beyond the limits of the City. As to this it is argued that to be consonant with due process requirements, regard must be had to the use as well as the source of the taxed funds. As far as the associations having offices outside of the City as well as within it are concerned, it is claimed that the proper measure is "the actual business done within the city" and not the amount of deposits only because of the fact that the office or offices at which a depositor may make withdrawals is used to ascertain which funds are to be taxed when deposited in a branch outside of the City though withdrawable within the City. This it is argued creates an extra-territorial effect in violation of due process. By using the "withdrawal" test, it is claimed that a policy of double taxation is thereby actuated.

These arguments are not sustainable for the simple reason that the council clearly expressed its intention to allocate the deposits and tax only those allocable to the City. And to the same end, the treasurer was authorized to use the "withdrawal" test (by way of rules to be promulgated by him) when separate accounting measures were not used. The deposits were to be credited for tax purposes to the office where the record of each deposit was kept. The intent was to channel these deposits into the proper office and not to base the tax on the fact that such deposits were deposited in some fortuitously chosen office outside of the City though credited to an account in an office inside of the City. As pointed out by the City, the associations apparently had no difficulty in allocating their deposits under the methods used since the returns filed appeared to be adequate. As for measuring the tax by the aggregate sums de-

posited, there is no authority for voiding the tax on this point. To base the tax on the use of the funds and allocate it on that basis might convert the tax into a property tax whereas the clear intent was to create a privilege tax. There was therefore no constitutional infringement. *Society for Savings v. Coite, supra.* The chance of double taxation is remote as long as it is apportioned as it must be. Finally, although the ordinance was assailed for being vague, there seems to have been no problem in administering it during the short period of its existence.

(iv)

The ordinance was also assailed on the theory that it improperly delegated legislative authority to the city treasurer to make and enforce rules and regulations governing its administration. But, as was pointed out by the lower court, the argument was purely academic since the treasurer had not found it necessary to promulgate the rules and regulations which might have been required had the ordinance not been made ineffective by the enactment of state-wide legislation.

(v)

Since it is apparent that the state savings and loan associations lacked standing to claim discrimination under the terms of 12 U. S. C. A. 1464(h), this last contention, which will be deemed to have been made by the federal savings and loan associations alone, is that the City, by not taxing the mutual savings banks, discriminated against them in that the failure to so do was a violation of § 1464(h), *supra.* Assuming the claim of the state institutions to have been made independently of the federal statute, the contention is still without merit because the differentiation in the application of the city ordinance based on a reasonable apprehension of unconstitutionality if the tax were applied without the differentiation is a reasonable exercise of legislative discretion. *Central Credit Union v. Comptroller of the Treasury,* 243 Md. 175, 185, 220 A. 2d 568, 574 (1966). Therefore, for the reasons stated in parts (i) through (iv) of this opinion and this portion of part (v)—and assuming for the time being, without presently deciding, that the ordinance severability clause permits the imposition of the tax on the state savings and loan associations even though the tax on the federal savings and loan associations may ultimately be

declared invalid—we agree that the order of the lower court, insofar as it affects the state associations, was correct.

Section 1464(h), *supra,* after providing that the federal savings and loan associations, with certain exceptions not here pertinent, should be exempt from all taxation imposed by the United States, further provides that—

> "no State, Territorial, county, municipal or local taxing authority shall impose any tax on such associations or their franchise, capital, reserves, surplus, loans, or income greater than that imposed by such authority on other similar local mutual or cooperative thrift and home financing institutions."

The claim of the federal savings and loan associations is that mutual savings banks are "other similar" institutions within the meaning of the federal statute and that the tax imposed by the City for the privilege of doing business therein could not be levied against them unless the mutual savings banks were assessed with the same tax. The City, on the other hand, claims that the difference between the federal associations and the savings banks are substantial enough to warrant the taxing of one and not the other.

As to these contentions, Judge Prendergast, in pointing out the fundamental differences between the "organization, powers and functions" of the savings banks and the federal savings and loan associations and citing *First Federal Savings and Loan Association v. Johnson,* 122 P. 2d 84 (Cal. App. 1942), *State v. Minnesota Federal Savings and Loan Association,* 15 N. W. 2d 568 (Minn. 1944) and *Laurens Federal Savings and Loan Association v. South Carolina Tax Commission,* 112 S. E. 2d 716 (S. C. 1960), reversed on other grounds, 365 U. S. 517 (1961), ruled as a matter of law that the federal statute was not an impediment to the taxing of the savings and loan associations.

A majority of this Court (Hammond, C. J., and Marbury, Oppenheimer and Finan, JJ.) think that question (v) as to whether or not the state mutual savings banks are similar to the federal savings and loan associations is a mixed one of law and fact and that for that reason the case should be re-

manded for the production of evidence as to whether in fact there is a similarity between the two types of institutions, but the writer of this opinion (Horney, J.) believes (as did the lower court but for a different reason) that the question is one of law and not of fact. The other members of the Court (Barnes and McWilliams, JJ.) did not sit.

There is a dearth of case law on the subject. None of the cases that has considered the meaning and effect of § 1464(h) are directly in point on the question this case presents. It is anomalistic that the only case which comes close to being apposite — *Commissioner of Corporations and Taxation v. Flaherty*, 28 N. E. 2d 433 (Mass. 1940)—instead of involving the taxation of the institutions referred to in the federal statute, concerned the imposition of a tax on income received by shareholders in federal savings and loan associations but not on income received by depositors in state cooperative banks. Among the cases in which the meaning and effect of § 1464(h) has been considered, some of the courts seem to have given the statute a narrow interpretation while in other courts there appears to be a trend toward a broader interpretation. The holdings in *Charleston Federal Savings and Loan Association v. James*, 200 S. E. 845 (W. Va. 1939) and *State v. Minnesota Federal Savings and Loan Association, supra* (15 N. W. 2d 568), imply that § 1464(h) was intended to prevent discrimination only in relation to state chartered savings and loan associations. But compare *Manchester Federal Savings and Loan Association v. State Tax Commission*, 191 A. 2d 529 (N. H. 1963), where it was held that the classification of state chartered credit unions as exempt from a franchise tax was reasonable and that the use of proceeds from the tax paid by federal savings and loan associations and state cooperative banks as an aid to education was not discriminatory under § 1464(h). Other cases, such as *Mercantile National Bank v. Hubbard*, 98 Fed. 465 (E. D. Ohio 1899) and *First National Bank v. First Federal Savings and Loan Association*, 225 F. 2d 33 (D.C.Cir. 1955), indicate that there are substantial similarities between savings banks and savings and loan associations. The *Johnson* case (122 P. 2d 84) and the state court *Laurens* case (112 S. E. 2d 716) did no more than point out that the statute per-

mitted the states and the lesser taxing authorities to tax federal savings and loan associations provided the rate is no greater than that imposed on similar local institutions. In the Supreme Court *Laurens* case (365 U. S. 517), where a state documentary stamp tax was invalidated, the Court said that § 1464(h) "unequivocally bars discriminatory state taxation of the federal savings and loan associations." No court, however, has expressly decided what the phrase "other similar local mutual or cooperative thrift and home financing institutions" really means.

Besides the inherent differences between the creditor-debtor relationship of depositors in mutual savings banks and the stockholder status of shareholders in savings and loan associations, there are still many differences between the two institutions with respect to the methods of organization, the restrictions on the power to make investments and in the banking systems under which the institutions operate as well as in the insurance facilities by which the savings on deposit are insured. But in some respects, at least, it may be that the dissimilarities are gradually becoming fewer with respect to the banking activities carried on by the institutions and particularly with reference to the savings function and the lending function.

On remand, in addition to the context of the case law and such law texts and commentaries [2] on the business activities of the institutions as are obtainable, the problem should be explored from all angles, as to which evidence is available, including such governmental and administrative statistics and reports [3]

---

2. See, for example, Conway, Savings and Loan Principles (1958); Russell, Savings and Loan Associations (2nd ed. 1960); Status of Mutual Savings Bank Depositors as Contrasted with Savings and Loan Shareholders, 14 Business Lawyer, 1047 (1959); Savings Banks and Savings and Loan Associations: The Past and Future, 16 Business Lawyer 170 (1960); The Law Affecting Savings Associations, Legal Bulletin, January 1964, pp. 32-33; The Definition of "Domestic Building and Loan Association"—Final Tax Regulations, 63 Mich. L. Rev. 1014 (1965).

3. See, for example, Fourth Report of Maryland Tax Survey Commission of 1949 (dated March 14, 1951), pp. 12, 13; Report of the Committee on Taxation and Fiscal Matters of the Legislative Council of Maryland, October 11, 1955; Federal Home Loan Bank System, pp. 4, 20-21, published by the System; Federal Reserve System Bulletin, October 1966, pp. 1493-94, 1506-07.

of which judicial notice may be taken. The evidence produced should include (though not be limited to) the definitional and historical development of the two institutions; the contrasting characteristics of savings and loan associations and mutual savings banks with respect to their federal, state and local tax status; the relationship of the depositors to each institution; the governmental controls; the nature of the activity of each as a savings institution; and the earnings on deposits, the nature of the investment portfolios and particularly the extent of individual home financing.

The question of fact to be decided is whether the difference between the mutual savings banks and federal savings and loan associations are of such substantiality as to warrant a finding that the two institutions are not similar.

Speaking for myself, it is, in my opinion, not necessary to remand the case for a determination as to whether or not the mutual savings banks are similar to the federal savings and loan associations, for even if it is assumed that the mutual savings banks are in fact "similar" to the federal savings and loan associations, it cannot be denied that each of the institutions paid taxes at exactly the same rate for the privilege of doing business in the State of Maryland for the year 1965. The only difference is that the mutual savings banks paid a *franchise* tax of ten cents on each one hundred dollars of their deposits to *the State,* whereas the federal savings and loan associations paid a *privilege* tax of ten cents on each one hundred dollars of their deposits to *the City*. To me, it is inconceivable that § 1464(h) *supra,* which was enacted to preclude the State and its constituent parts from discriminating against the federal savings and loan associations in favor of other similar institutions was (despite the use of the conjunction "or" instead of "and" and the use of the singular noun "authority" instead of the plural "authorities") ever intended to require the City as a component part of the State to discriminate against the mutual savings banks in favor of the federal savings and loan associations. For these reasons, it seems obvious to me, at least, that the federal savings and loan associations were not in fact discriminated against in this case. So, regardless of whether or not there

were other legal and factual similarities or dissimilarities between the two types of financial institutions here involved, there was, taxwise, no reasonable basis for the lower court to rule that such institutions were treated differently in this case.

> *Case remanded without affirmance or reversal of orders sustaining demurrers of City of Baltimore to bills of complaint of the state and federal associations with respect to questions (i) through (iv); case remanded without affirmance or reversal for further proceedings as to question (v); costs to abide the result.*