412 A.2d 1366

CITY OF PITTSBURGH, a Municipal Corporation, and Joseph L. Cosetti, Treasurer, Appellants,

v.

ALLEGHENY VALLEY BANK OF PITTSBURGH, Commercial Bank and Trust Company, Iron and Glass Bank, Keystone Bank, North Side Deposit Bank, State Banking Associations, Mellon Bank, N. A., Pittsburgh National Bank, the Union National Bank of Pittsburgh and Equibank, N. A., National Banking Associations.

Supreme Court of Pennsylvania.

Argued Sept. 20, 1979.

Decided March 20, 1980.

546

Mead J. Mulvihill, Jr., City Sol., Grace S. Harris, Executive Asst. City Sol., Pittsburgh, for appellants.

Everett K. Dilworth, William H. Dickey, Jr., Tucker, Arensberg, Very & Ferguson, Pittsburgh, for Pittsburgh Nat. Bank.

William B. Mallin, Ray C. Stoner, Eckert, Seamans, Cherin & Mellott, Pittsburgh, for Allegheny Valley Bank of Pittsburgh, Commercial Bank & Trust Co., and Iron and Glass Bank.

Abraham Fishkin, Pittsburgh, for Keystone Bank.

James F. Malone, III, Brandt, Milnes, Rea & Malone, Pittsburgh, for North Side Deposit Bank.

Carl E. Glock, Jr., J. Sherman McLaughlin, Reed, Smith, Shaw & McClay, Pittsburgh, for Mellon Bank, N. A.

Robert H. Stevenson, Anderson, Moreland & Bush, Pittsburgh, for Equibank, N. A.

George L. Cass, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, for Union Nat. Bank of Pittsburgh.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, MANDERINO, LARSEN and FLAHERTY, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

Since 1969, the City of Pittsburgh has imposed a Business Privilege Tax on local business revenues.[1]  On August 30, 1973 the City brought assumpsit actions in the Allegheny County Court of Common Pleas against five state banks and four national banks for failure to pay this tax.[2]  The City

[1]. The Business Privilege Tax, imposed by Ordinance No. 675 (effective February 1, 1969), as amended by Ordinance No. 594 (effective December 30, 1970), taxes business revenues at the rate of six mills. The ordinance excludes from a bank's revenues the "cost of securities and other property sold, exchanged, paid at maturity, or redeemed, and moneys or credits received in repayment of advances, credits and loans, but not to exceed the principal amount of such advances, credits and loans, and shall also exclude deposits."

[2]. The state banks are the Allegheny Valley Bank of Pittsburgh, Commercial Bank and Trust Co., Iron and Glass Bank, Keystone Bank, and North Side Deposit Bank.  The national banks are the

alleged that the state banks were subject to the Business Privilege Tax for the years 1969 to 1973, resulting in unpaid tax liability of at least $300,000, and that the national banks were subject to the Business Privilege Tax for the years 1970 to 1973, resulting in unpaid tax liability of at least $4,000,000.[3] The banks admit not paying the tax, but claim that the tax is invalid as applied to them.

The actions were consolidated and tried without a jury. The trial court held that the Bank Shares Tax Act and the Local Tax Enabling Act exempted appellee banks from this tax.[4] The court decided, however, that certain "nontraditional" banking activities were subject to the Business Privi-

Mellon Bank, N.A., Pittsburgh National Bank, Union National Bank, and Western Pennsylvania National Bank (changed to Equibank, N.A.).

3. Appellant asserts that the liability of the state banks commenced with the effective date of the tax ordinance on February 1, 1969. Before December of 1969, it was impermissible for a Pennsylvania municipality to tax a national bank. See National Bank Tax Act, 12 U.S.C.A. § 548. Appellant avers, however, that the 1969 amendment to the Act permitted a tax like the Business Privilege Tax to be imposed on national banks as of December 24, 1969. See P.L. 91–156, 83 Stat. 434.

4. The Bank Shares Tax Act, March 4, 1971, P.L. 6, § 701, 72 P.S. § 7701 (Supp. 1979–80), derived from Act of July 15, 1897, P.L. 292, § 1, as amended, 72 P.S. § 1961, exempts banks that pay the shares tax from local taxation on "the shares, and so much of the capital and profits . . . as shall not be invested in real estate." Both appellee state and national banks pay this shares tax. The trial court held that the Business Privilege Tax was a profits tax, and that it was therefore proscribed by the Act. The court found support for its holding in *Oil City v. Oil City Trust Company,* 151 Pa. 454, 25 A. 124 (1892). In light of our disposition here, we need not reach the issue of whether the Business Privilege Tax should be considered a profits tax for purposes of the Bank Shares Tax Act.

The Local Tax Enabling Act, December 31, 1965, P.L. 1257, § 3, 53 P.S. § 6903, confers upon political subdivisions the "power to levy, assess and collect taxes upon any and all subjects of taxation . . . which the Commonwealth has power to tax but which it does not tax or license." The trial court ruled that the fees paid by the state banks to the Department of Banking preempted the Business Privilege Tax under the Enabling Act. In light of our decision today, we need not reach this issue.

lege Tax.[5] The Commonwealth Court reversed the trial court's holding as to the taxability of "nontraditional" banking activities, but in all other respects affirmed the court's decision. This Court granted allowance of appeal. We affirm.

## I.

The question presented is whether appellant City of Pittsburgh may validly impose its Business Privilege Tax upon the business of appellee banks. The Local Tax Enabling Act, if read alone, may possibly sustain appellant's tax, for it grants municipalities "the power to levy, assess and collect taxes upon any and all subjects of taxation which the Commonwealth has power to tax but which it does not tax or license." However, the Legislature's enactment of comprehensive banking legislation compels our consideration of whether local taxation upon the business of banks has been preempted.

When laws, such as the banking legislation, "are silent as to whether municipalities are or are not permitted . . . to impinge in any manner upon the field entered by the state . . . [,] the question whether municipal action is permissible must be determined by an analysis of the provisions of the . . . [relevant legislation] in order to ascertain the probable intention of the legislature in that regard."

*Western Pennsylvania Restaurant Ass'n v. Pittsburgh*, 366 Pa. 374, 380–81, 77 A.2d 616, 619–20 (1951) (Opinion by Justice, later Chief Justice, Horace Stern); see *Harris-Walsh, Inc. v. Dickson City Borough*, 420 Pa. 259, 216 A.2d 329 (1966); *Department of Licenses v. Weber*, 394 Pa. 466, 147 A.2d 326 (1959). Review of the Commonwealth's banking laws discloses the Legislature's intention to exclusively reserve regulation of the state banks to the Commonwealth. It is clear, moreover, that appellant's Business Privilege Tax

5. The "nontraditional" banking activities were: (1) selling merchandise at bargain rates to attract new depositors, (2) selling insurance, (3) operating a travel agency, and (4) selling computer time.

impermissibly "impinges" upon this regulated area in contravention of the legislative preemption for the Commonwealth. It must be concluded therefore that appellee state banks are not taxable under appellant's ordinance. Because federal law prohibits discrimination in taxation between state and national banks, it would be impermissible to impose this tax upon national banks while excluding state banks from such taxation. Hence, we hold that appellant's tax is also invalid as applied to appellee national banks.

## II.

The Banking Code[6] and the Department of Banking Code[7] manifest the Legislature's intention to exclusively occupy the state banking field. These Codes impose statutory requirements and standards upon virtually all aspects of banking. There are provisions, for example, governing the powers of commercial and saving banks, 7 P.S. §§ 301–317 and 501–512, bank deposits, §§ 601–610, a bank's capital structure, §§ 1101–1105, shares and shareholders, §§ 1201–1222, incorporation, §§ 1001–1011, and duties as a fiduciary, §§ 401–407.

The Legislature established the Department of Banking to supervise the activities of state banking institutions. See *Delaware County Nat'l Bank v. Campbell,* 378 Pa. 311, 314, 106 A.2d 416, 418 (1954); *Commercial Bank Corp. v. Freeman,* 353 Pa. 563, 567, 46 A.2d·233, 235 (1946). The Legislature assigned various mandatory duties to the Department,[8] and vested in it "auditory, investigatory and inquisitorial power . . ." to carry out these functions. *Stahl v. First Pa.,* 411 Pa. 121, 131, 191 A.2d 386, 392 (1963).

6. Act of November 30, 1965, P.L. 847, §§ 101 et seq., as amended, 7 P.S. §§ 101 et seq.

7. Act of May 15, 1933, P.L. 565, §§ 1 et seq., as amended, 71 P.S. §§ 733–1 et seq.

8. These functions of the Banking Department include bank examinations, 71 P.S. §§ 733–401 to 733–404, enforcing proper banking practices upon banks, §§ 733–501 to 733–505, and taking possession of banks as a receiver, §§ 733–601 to 733–1014.

The Legislature also granted broad supervisory power to the Department of Banking. The Department is charged with the responsibility of protecting the safety and soundness of all banking institutions:

> "[The Department] shall exercise such general supervision over institutions as will afford the greatest possible safety to depositors, other creditors, and shareholders thereof, insure the safe and sound conduct of the business of such institutions, conserve their assets, maintain the public confidence in such institutions and protect the public interest."

71 P.S. § 733–202. In addition, the Department is legislatively directed to foster a "progressive" banking industry in this Commonwealth by promoting "competition" and the growth of diversity in the banking industry, encouraging banks to adapt to the changing community and economy, providing bank management more leeway in the development of bank operations and policy, and shaping its own regulations to "meet changes in banking and economic conditions without repeated, detailed legislative amendment." 7 P.S. § 103(a)(v)–(ix) and Comment; [9] see also *Pennsylvania Bankers v. Secretary of Banking,* 481 Pa. 332, 392 A.2d 1319 (1978).

The Great Depression is a stark reminder that the economic fate of our Commonwealth is tied to the soundness and progress of its banking institutions. Banks possess a "delicate nature," so that even sound banks may be in jeopardy of collapse when one or more in the general area fail. *Dauphin Deposit Trust Co. v. Myers,* 401 Pa. 230, 236, 164 A.2d 86, 89–90 (1960); cf. *Conestoga Nat'l Bank v. Patterson,* 442 Pa. 289, 300, 275 A.2d 6, 11 (1971). It is the legislative judgment that unified state-wide regulation of banks is the best method for protecting the soundness and integrity of banking institutions.

---

**9.** Section 104 of the Banking Code provides in part:
   "The comments of the commission which drafted this act may be consulted in the construction and application of its original provisions."

"Local authorities not only are ill-equipped to comprehend the needs of the public beyond their jurisdiction, but, and equally important, these authorities, if they had the power to regulate, necessarily would exercise that power with an eye toward the local situation and not with the best interests of the public at large as the point of reference."

*Duquesne Light Co. v. Upper St. Clair Twnshp.*, 377 Pa. 323, 336, 105 A.2d 287, 293 (1954); see *Duquesne Light Co. v. Monroeville Borough*, 449 Pa. 573, 298 A.2d 252 (1972). Thus there is no position in the legislative schema for municipal "impingement" in the uniform state-wide regulation of banking institutions.[10]

## III.

It is well established in this Commonwealth that a municipal regulation may not intrude into areas preempted by the state.[11]   This concept is equally applicable to local taxation.   See e.g., *Allegheny Airlines v. Philadelphia*, 453 Pa. 181, 309 A.2d 157 (1973) (state or local airport head tax preempted by congressional legislation); *United Tavern Owners v. Philadelphia School District*, 441 Pa. 274, 272 A.2d 868 (1971) (opinion announcing the judgment of the court) (municipal retail liquor tax preempted by state); *Tempe v.*

**10.**   Like the Commonwealth Court, we see no reason to distinguish "traditional" from "nontraditional" banking activities.   Both are within the scope of the Banking Department's supervision, and so within the area preempted by the Legislature.

   "Nontraditional" is a vague characterization, totally unidentified in any ordinance, regulation, or anywhere else.   It appears to be the creation of the trial court.   The designation of "nontraditional" banking functions is internally inconsistent.   The mere labelling of some services the bank provides for its customers as "nontraditional" does not alter the reality that the bank is rendering banking services authorized by the bank's charter and approved by the Secretary of Banking under the Banking Code.   See 7 P.S. §§ 315(e), 103 (1967).   Were it otherwise, would not the bank's activity be ultra vires?   What is labelled "nontraditional" are banking services producing bank revenues and earnings which are reflected in the bank share tax, already taxed and paid to the Commonwealth.

**11.**   E. g., *Harris-Walsh, Inc. v. Dickson City Borough*, supra; *Department of Licenses v. Weber*, supra; *Warren v. Philadelphia*, 382 Pa. 380, 115 A.2d 218 (1955); *West. Pennsylvania Restaurant Ass'n v. Pittsburgh*, supra.

*Prudential Insurance Co.*, 109 Ariz. 429, 510 P.2d 745 (1973) (municipality preempted by state from taxing insurance company rental income); *East Ohio Gas Co. v. Akron*, 7 Ohio St.2d 73, 218 N.E.2d 608 (1966) (municipality preempted by state from taxing utility income); *Parker v. Silverton*, 109 Or. 298, 220 P. 139 (1923) (municipality preempted by state from taxing transit company); see also *McCulloch v. Maryland*, 4 U.S. (4 Wheat. 316) 415 (Curt.Ed.), 4 L.Ed. 579 (1819) (state preempted by Congress from taxing national bank); *Weston v. Charleston*, 8 U.S. (2 Pet. 449) 171 (Curt.Ed.), 7 L.Ed. 481 (1829) (municipality preempted from taxing federal bonds); see generally Antieau, 2A Local Government Law § 21.10 (1979 ed.); McQuillin, Municipal Corporations § 44.190a (1973 ed.).

■ As appellant's complaint indicates, the tax liabilities which appellant imposed upon appellee state banks are not nominal. To the contrary, appellant seeks tax payments, calculated as a percentage of bank revenues, which would impose additional costs on appellees' business operations in the city. Thus the Business Privilege Tax creates a direct burden upon the banking business of appellees.

The Business Privilege Tax cannot be viewed in any sense as supplementary to, or consistent with, the Legislature's objectives in regulation of banks. Rather, the challenged local tax on bank revenues manifestly intrudes into the Legislature's regulatory schema. Such a direct tax burden on appellee state banks undercuts the Banking Department's responsibility, as well as its capacity, to regulate the soundness of banks, and promote their proper development. Were we to permit municipal taxing authorities in the Commonwealth to impose various business taxes upon state banks, such an accumulation of tax plans would surely impair the legislatively mandated supervisory authority of the Banking Department. Appellant may not, by the challenged tax ordinance, contravene the Legislature's plenary statewide schema for the regulation and operation of the Commonwealth's banking institutions.

Concluding, as we must, that taxation of bank revenues is preempted by the Commonwealth, and that the Business Privilege Tax impermissibly "impinges" upon this area, we hold that Pittsburgh's tax is invalid as applied to appellee state banks.[12]

## IV.

■ Our holding as to appellee state banks, as already stated, necessarily invalidates application of the Business Privilege Tax to appellee national banks. Since December of 1969, the National Bank Tax Act, 12 U.S.C.A. § 548 (Supp.1979) has authorized state taxation of national banks only so long as the tax is a "nondiscriminatory tax generally applicable to state banks." *Chase Manhattan Bank, N. A., v. Finance Administration of N. Y. C.*, 440 U.S. 447, 99 S.Ct. 1201, 1202, 59 L.Ed.2d 445 (1979).[13] Since the Business Privilege Tax may not be imposed upon the state banks, so too, it may not be applied to appellee national banks.

The order of the Commonwealth Court is affirmed.

MANDERINO, J., did not participate in the decision of this case.

FLAHERTY, J., joins this opinion and files a concurring opinion, joined by LARSEN, J.

NIX, J., files a dissenting opinion, joined by EAGEN, C. J.

**12.** Today's decision of course does not exempt state banks from all municipal taxation. The determination whether a tax is preempted must always turn on an examination of the Legislature's intent. See *Western Pennsylvania Restaurant Ass'n v. Pittsburgh*, supra. It is clear, for example, that municipal taxation of banks' real estate is not preempted by the Legislature. See 72 P.S. § 7701.

**13.** The 1969 amendment to the National Bank Tax Act, 12 U.S.C.A. § 548 (Supp.1979), provides that as of January 1, 1973, "a national bank shall be treated as a bank organized and existing under the laws of the State . . . ." This amendment contained temporary provisions allowing more limited state taxation of national banks "to the same extent as such tax is imposed on a bank organized and existing under the laws of such State," between December 24, 1969 and January 1, 1973. Pub.L. No. 91–156, 83 Stat. 434.

FLAHERTY, Justice, concurring.

While I join with the majority opinion that municipal imposition of the Business Privilege Tax on the appellee banks is preempted by the Commonwealth's comprehensive system of banking legislation, I feel that the issue of whether to distinguish "traditional" from "nontraditional" banking functions warrants further comment. The "traditional" role of banks as receivers of demand deposits has evolved to a present day operation whereby banks provide a wide range of inducing services including the sale of merchandise at bargain prices to attract new depositors, sale of insurance, operation of a travel agency, and sale of computer time. Clearly, banks offer services which compete with those marketed by businesses which are subject to the burden of the Business Privilege Tax. Determination of the wisdom of such a differential tax treatment is, however, solely a matter for our legislative bodies, not the courts.

The Department of Banking Code established a very broad supervisory power over banks to "insure the safe and sound conduct of the business of such institutions, conserve their assets, maintain the public confidence in such institutions and protect the public interest."[1] No exception was provided with respect to "nontraditional" functions. The Banking Code grants to banks "[a]ll powers incidental to the conduct of banking business"[2] and the official comment thereto by the Banking Law Commission states:

"The provision covers a *wide range and variety of activities* in which institutions engage as part of the conduct of their banking business and is intended to cover other activities in which institutions may engage in the future. The variety of such activities appears from the following examples which are merely illustrative and not definitive: *the sale of data processing services*; the *conduct of a travel department*; payroll accounting; and the rental of conference rooms for real estate settlements and other business transactions." (Emphasis added)

1. Act of May 15, 1933, P.L. 565, § 202, 71 P.S. § 733–202 (1962).

2. Act of November 30, 1965, P.L. 847, § 315, 7 P.S. § 315(e) (1967).

In an official comment to the Banking Code's declaration of legislative purpose,[3] the Banking Law Commission further stated:

"The premises underlying such policies recognized by this act are that contemporary banking faces, and should have the opportunity fairly to meet, a high degree of *competition not only from other banks* but also, in virtually all principal functions, from a large number and variety of other financial organizations . . . ." (Emphasis added)

Hence, the General Assembly has made clear its intent that *banking institutions* be permitted to engage in an extensive scope of activities, and consequently that there be an encompassing power of supervision vested in the Department of Banking. We are not here confronted with a case where legislative intent to occupy a field of regulation is not clearly expressed but rather with one where that intent is so manifestly all-encompassing that preemption is evident. Hence, imposition of the tax burden in question would encroach upon a legislatively preempted area.

LARSEN, J., joins in this concurring opinion.

NIX, Justice, dissenting.

The result reached by Mr. Justice Roberts is a product of not seeing the forest through the trees. Today's opinion of the Court correctly states that the state legislature intended to "exclusively occupy the state *banking* field." At 1369, emphasis added. This observation, however, does not compel the conclusion that the legislature also intended to deprive municipalities of their statutory power to levy taxes applicable to all businesses within the municipality.[1] The Pittsburgh Business Privilege Tax[2] does not intrude upon the state's exclusive domain of bank *regulation*, it merely

3. Act of November 30, 1965, P.L. 847, § 103, 7 P.S. § 103 (1967).

1. Local Tax Enabling Act of 1965, Act of December 31, 1965, P.L. 1257, *as amended*, 53 P.S. §§ 6901 *et seq*.

2. Ordinance No. 675 (effective February 1, 1969), *as amended* by Ordinance No. 594 (effective December 30, 1970).

requires banks located within the City of Pittsburgh to pay the same tax that every other business in Pittsburgh pays.

I concede that this case presents the Court with the troublesome issue of tacit preemption of local enactments by state laws. The opinion of the Court, however, fails to articulate either a standard or a method of analysis by which this recurring problem can be resolved. Indeed, it sweeps away what fragmentary structures for the resolution of these matters that have existed previously.

Prior to today two lines of decisions concerning preemption existed in our case law: cases involving regulatory preemption—including zoning cases—and cases involving taxation.[3] Cases from these two distinct areas of law were merged for the first time in Mr. Justice O'Brien's opinion in *United Tavern Owners of Philadelphia v. School District of Philadelphia*, 441 Pa. 274, 272 A.2d 868 (1971), an opinion devoid of precedential authority.[4] Today's opinion of the Court further confuses this issue by its heavy reliance upon the *United Tavern* decision. If preemption law in our jurisdiction is to have any predictability, this Court must clarify the controlling principles for its applicability.

*United Tavern* and *Allegheny Airlines v. Philadelphia*, 453 Pa. 181, 309 A.2d 157 (1973) are the only Pennsylvania authority cited by Mr. Justice Roberts for his contention that "[i]t is well established in this Commonwealth that a municipal regulation may not intrude into areas preempted by the state. This concept is equally applicable to local taxation." At 1370 (footnote omitted). *United Tavern*, aside from not being precedential, found preemption of a

---

3. *See* Dalzell, The State Preemption Doctrine: Lessons From the Pennsylvania Experience, 33 U.Pitt.L.Rev. 205 (1971).

4. Although the Court was composed of seven members, only five participated in the consideration and decision of the case. Mr. Justice O'Brien wrote an opinion of the Court in which Chief Justice Bell and Mr. Justice Roberts concurred in the result, Justice Pomeroy filed a dissenting opinion in which our current Chief Justice joined, and Justices Jones and Cohen did not participate.

local tax on retail liquor sales *only* when the Commonwealth's monopolistic regulation of liquor was coupled with two different state levies on retail liquor sales. The fact of pervasive state regulation alone was insufficient to justify a finding of preemption, *see* 441 Pa. at 282, 272 A.2d 868. The case was decided on the ground that "because the sales of liquor are already subject to two state taxes, the state has preempted the specific field of liquor sales for taxation purposes." *Id.*, 441 Pa. at 284, 272 A.2d at 873. The state has not enacted tax legislation in the instant case that indicates any intent to preempt the field of business privilege taxes even when such taxes are applied to banks. The *Allegheny Airlines* case also is inapposite to today's case. There the Court found that the United States Congress had preempted the field of airport head taxes and that the federal Constitution by virtue of the supremacy clause barred state or local taxes on the same subject. Obviously, these weighty issues of federal constitutional law are not present in the instant case. Consequently, a majority of this Court has never held that the legislature's enactment of a state-wide regulatory program is evidence of the legislature's intent to strip a local governmental entity of an expressly conferred power to tax.

The miscellany of non-Pennsylvania authority cited by Mr. Justice Roberts at p. 1370 detract from, rather than sustain, his analysis. The Arizona Supreme Court in *Tempe v. Prudential Insurance Co.*, 109 Ariz. 429, 510 P.2d 745, relied on an express statutory provision which read, "the state pre-empts the field of imposing excise, privilege, franchise, income, license and similar taxes upon insurers and their general agents . . .." in striking down the municipal levy. In *East Ohio Gas Co. v. Akron*, 7 Ohio St.2d 73, 218 N.E.2d 608, the Ohio Supreme Court was concerned with a conflict between a state gross receipts tax upon public utilities and a municipal tax and not with the asserted preemptive effect of a state regulatory scheme on municipal taxing power involved in the instant case. Even so, the

Court questioned its own "obscure, ambiguous, inconsistent and on occasion almost contradictory" application of the implied preemption doctrine in the state and local tax area and stated that the doctrine's continued vitality in Ohio was based on "the Court's antipathy to 'double taxation'"—a policy consideration wholly irrelevant to the instant case. 218 N.E.2d at 610. Again, *Parker v. Silverton*, 109 Or. 298, 220 P. 139, has nothing to do with this case since it involved an attempt by a locality with statutory authority to impose a tax which it did not have authority to levy in the guise of a regulatory license fee. *McCulloch v. Maryland*, 4 U.S. (4 Wheat. 316) 415 (Curt. Ed.), 4 L.Ed. 579, and *Weston v. Charleston*, 8 U.S. (2 Pet. 449) 171 (Curt. Ed.), 7 L.Ed. 481, have to do with state and local taxation of Federal instrumentalities where, unlike the case at bar, the Congress has not consented to state and local taxation. *See* 12 U.S.C.A. § 548 (Supp.1979).

The McQuillin treatise cited by Mr. Justice Roberts flatly contradicts their approach: "And where no express prescription as to other taxes appears, the doctrine of preemption, under which if state legislation imposes a tax upon a specific subject matter municipalities are deemed without power to impose a similar or further tax upon the same subject, may apply as an additional limit upon the municipal taxing power." McQuillin, Municipal Corporations, § 44.190a. Both treatises and the cases cited therein require that there be a conflict between a local tax and a state tax on the same subject before the doctrine of implied preemption can be invoked. Antieau, 2A Local Government Law, § 21.10 (1979 ed.).

In addition to its inconsistency with the analysis broadly enunciated in the leading treatises, Mr. Justice Roberts' position is not sustained in pertinent cases in other jurisdictions. In considering an argument that comprehensive state and federal regulatory authority impliedly preempted a local excise tax on the purchase of tangible personal property as

applied to the purchase of liquor, the California Supreme Court observed that such a tax is no more regulatory of "the liquor retailer in his business pursuit than are local and non-discriminatory fire ordinances, electrical plumbing and building restrictions, zoning limitations, and the like." *Ainsworth v. Bryant*, 34 Cal.2d 465, 211 P.2d 564, 570. *American National Bldg. & Loan Assn. v. City of Baltimore*, 245 Md. 23, 224 A.2d 883 (sustaining city privilege tax levied on savings and loans where state franchise tax on savings and loans was in nature of fees imposed to raise revenues for regulatory purposes); *State Farm Mutual Ins. Co. v. Temple*, 176 Colo. 537, 491 P.2d 1371 (1971) (state regulation of insurance industry did not preclude imposition of doing business tax by city). *Compare Callaway v. City of Overland Park*, 211 Kan. 646, 508 P.2d 902 (1973) (sustaining city occupation tax on business of renting property despite express statutory prohibition of city excise tax on sale, transfer or use of property); *P. Lorillard v. City of Seattle*, 83 Wash.2d 586, 521 P.2d 208 (1974) (city occupation tax on wholesalers valid as applied to wholesalers of cigarettes).

The mischievousness of Mr. Justice Roberts' opinion is further illustrated by its cavalier failure to address itself to the teaching of the cases of this jurisdiction sustaining the validity of local taxes which were arguably subject to statutory preemption. In *Smith, Kline & French v. Philadelphia*, 437 Pa. 197, 262 A.2d 135 (1970), for example, the Court upheld the imposition of the Philadelphia Mercantile License Tax against a business subject to state exactions, because the payments to the state were intended as part of a regulatory schema and did not support the inference that the state intended to preempt local taxing jurisdiction. This closely analogous case is not mentioned by Mr. Justice Roberts. Neither is *F. J. Busse Co. v. Pittsburgh*, 443 Pa. 349, 279 A.2d 14 (1971), which upheld the Pittsburgh Business Privilege Tax—the same tax now challenged—against the claims that the state had preempted the area by already taxing the subject matter of the Pittsburgh tax. In fact,

Mr. Justice Roberts has failed to cite any Pennsylvania cases dealing with business privilege taxes, the subject matter of the present case.

In place of a structured legal analysis, Mr. Justice Roberts justifies his result by raising the spectre of the "Great Depression," the "delicate nature" of banks, and his belief that the Business Privilege Tax "undercuts the Banking Department's responsibility, as well as its capacity, to regulate the soundness of banks." At 1371. He offers no authority in support of this belief. Significantly, representatives from neither the State Banking Department or any other state office have objected to the Pittsburgh tax. If the State Banking Department does not object to this, can it be said that the Department's ability to function will be destroyed by this tax?

The answer is that Mr. Justice Roberts mixed apples and oranges and created a lemon. His opinion states that the state has legislated upon virtually all aspects of banking, including the powers governing commercial and savings banks, bank deposits, a bank's capital structure, shares and shareholders, incorporation, and fiduciary duties. At 1369. I fail to understand how a six mill tax will affect the ability of the state to regulate these aspects of banking.

Since the language of the Local Tax Enabling Act expressly gives the City of Pittsburgh the "power to levy, assess and collect taxes upon any and all subjects of taxation . . . which the Commonwealth has power to tax but which it does not tax or license,"[5] an option which has been exercised by the City of Pittsburgh by ordinance, the effect of today's decision is to infer from bank regulatory enactments an exemption from the city's business privilege tax. This result plainly contravenes the rule that a statutory provision purporting to exempt persons and property from taxation must be strictly construed. 1 Pa.C.S.A. § 1928(b)(5); *Bd. of Revision of Taxes of Philadelphia v.*

5.  § 53, P.S. § 6903.

*United Fund of Philadelphia Area,* 11 Pa.Cmwlth. 201, 314 A.2d 530 (1973).

It is clear that the subject matter of the Pittsburgh Business Privilege Tax is not one already subject to state taxation. *F. J. Busse Co. v. Pittsburgh, supra.* There the Court said of the instant tax:

By definition, the tax imposed by the City is not an income tax, but rather a tax on a privilege which is measured by the gross receipts collected from conducting a business and *not* by the amount of profit made by the taxpayer.

443 Pa. 349 at n. 1, 279 A.2d 14 at n. 1 (emphasis in the original).

The United States Congress, after a comprehensive series of studies which considered and rejected all the policy arguments raised by Mr. Justice Roberts in part III of his opinion,[6] has chosen to consent to state and local taxation of national banks.[7] Localities by the force of the language of the Local Tax Enabling Act share in that power to the extent that the Commonwealth does. Diversity in local choice as to the subjects of taxation is the essence of the Local Tax Enabling Act. Should the legislature wish to take cognizance of the policy arguments used by the majority to justify its result, it can simply amend the laws of this Commonwealth, as it did in the wake of this Court's decision in *United Tavern Owners, supra,*[8] to reflect these concerns. But this Court has not been deputized to do what a majority

6. U.S. Senate, Committee on Banking, Housing, and Urban Affairs, State and Local Taxation of Banks—Report of a Study Under Public Laws 91–156 and 92–213 (92d Congressional Second Sessions) (June, 1972); U.S. Senate, Committee on Banking, Housing and Urban Affairs, state and local "Doing Business" Taxes on Out-of-State Financial Depositories, Report of a Study Under Public Law 93–100 (94th Cong. 1st Sess. May, 1975).

7. 12 U.S.C.A. § 548 (Supp.1979).

8. First Class School District Liquor Tax Sales Act, Act of June 10, 1971, P.L. 153, No. 7.

of this Court speculates that the legislature should do to protect the state banking industry from local taxes.

EAGEN, C. J., joins this opinion.