Daniel M. Tabas, Petitioner *v.* Commonwealth of Pennsylvania, Department of Banking, Respondent.

Argued September 10, 1980, before President Judge CRUMLISH and Judges WILKINSON, JR., MENCER, BLATT, CRAIG, MACPHAIL and WILLIAMS, JR., Judge ROGERS did not participate.

*Morris R. Brooke,* with him *Lewis H. Van Dusen Jr.,* and *Thomas J. Leach, Drinker, Biddle & Reath,* for petitioner.

*Elisabeth S. Shuster,* Deputy Attorney General, with her, *John E. Nanorta* and *Bonnie Jean McRobbie,* Assistant Attorneys General, *Allen C. Warshaw,* Deputy Attorney General, and *Edward G. Biester, Jr.,* Attorney General, for respondent.

OPINION BY PRESIDENT JUDGE CRUMLISH, November 13, 1980:

Daniel M. Tabas appeals a Department of Banking (Department) decision which conditioned his ownership of shares of Lincoln National Company (Lincoln). We affirm in part and reverse in part.

In November, 1977, at the request of Norman D. Denny (Chairman of Lincoln National Company), the Department commenced proceedings against Tabas under Section 112 of the Banking Code of 1965, Act of November 30, 1965, P.L. 847, *as amended,* 7 P.S. §112. The Section 112 proceeding was based on a discovery

that Tabas, together with his wife and son, held a 14.35% stock interest in Lincoln, a holding company for Lincoln National Bank.[1]

Section 112(b) of the Code, 7 P.S. §112(b), provides:

> [I]t shall be unlawful, without the prior written approval, of the department pursuant to this section, for any person to acquire, or to make a proposal to acquire, shares of an institution or shares of a corporation which controls an institution *if the aggregate number of shares held after such acquisition would total more than ten percent of the outstanding shares* of such institution or corporation, whether or not any prior acquisition had been approved by the department pursuant to this section. (Emphasis added.)

For purposes of calculating a person's percentage "ownership" in a banking institution, Section 112(a)-(i) specifically includes stock "ownership by a spouse or member of the family of such person. . . ." 7 P.S. §112(a)(i).

Realizing that he had failed to procure Departmental approval for his 14.35% interest in Lincoln, Tabas filed an "after the fact" Section 112 application on January 20, 1978, requesting continued ownership of his Lincoln securities.[2] On September 27,

---

[1] Although the record is unclear, it can be inferred that the Department did not *sua sponte* commence the Section 112 proceeding. Rather, an on-going personal dispute between Tabas and Denny erupted and Denny, in apparent retaliation, reported the possible Section 112 violation to the Department.

[2] Rigorous objections were lodged by Denny on behalf of Lincoln's board, and Tabas's application was denied on February 21, 1979. While an appeal was pending in this Court, Denny suddenly withdrew his earlier objections to Tabas's continued ownership of Lincoln securities and this Court remanded for Departmental reconsideration.

1979, the Department approved both his personal and "family" ownership of 14.35% of Lincoln's shares but imposed the following conditions on continued ownership:

(1) Further acquisitions of Lincoln's shares by Tabas or his wife and son must receive the Department's prior written approval;

(2) So long as Tabas or his family hold more than 10% of the outstanding shares of Lincoln, his son Lee E. Tabas, may not be employed either as an officer or an employee of Lincoln Bank.

(3) Lee E. Tabas may not receive a fee, compensation, or other remuneration for his service as director, chairman, or member of the Board of Directors of Lincoln or Lincoln Bank in excess of remuneration paid to other Lincoln directors, chairman, or Board members.

Tabas, singly and on behalf of his family, objects to the conditions and argues that their imposition is unauthorized by Section 112(c) of the Code.[3] As to enumerated conditions (2) and (3), we must agree.[4]

---

[3] Tabas argued in the alternative that the Department engaged in unconstitutional "selective enforcement" by not enforcing Section 112 against Denny. Although the record suggests that Denny was also in violation of Section 112, we are of the opinion that the Department's failure to act against him did not rise to the constitutional level of "selective enforcement" as postured in *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). Moreover, our Supreme Court has given the legislature plenary power to regulate the Commonwealth's banking institutions. *See City of Pittsburgh v. Allegheny Valley Bank of Pittsburgh*, Pa. , 412 A.2d 1366 (1980). We are therefore loathe to inquire into the Department's reasons for enforcing Section 112 against the petitioner to Denny's exclusion.

[4] We must affirm the Department's decision in imposing condition (1). As Tabas already held shares in excess of 10%, Section 112(b) specifically requires that any further acquisitions are subject to written approval by the Department.

The statutory authority for the imposition of conditions on an individual's ownership of stock in a banking institution is Section 112(e) of the Code:

> If the department approves a proposed acquisition *which may result in a change of control* of such institution or corporation it may impose conditions.... (Emphasis added.)

"Control" in Section 112(e) is defined in Section 112(a)(ii) as:

> the power to elect a *majority of the board* of directors of an institution or corporation. (Emphasis added.)

By applying the clear language of Section 112(e) and Section 112(a)(ii) and the mechanics of cumulative voting to the following facts, we are compelled to strike enumerated conditions (2) and (3).

On February 1, 1979, Lincoln had a total equity participation of 307,055 shares and a 17-member Board of Directors that was staggered and elected by cumulative voting.[5] Of the 17 directors, five were slated for election in 1979.

Through the mechanics of cumulative voting, we can establish that 51,176.8 shares were required to ensure the election of a single director in 1979.[6] Since

---

[5] We choose the calendar year 1979 for our analysis since this is the time frame in which the Department imposed conditions on Tabas's continued ownership of Lincoln securities.

[6] *See* C. Williams, Cumulative Voting for Directors 6-7 (1951) ; Campbell, "The Origin and Growth of Cumulative Voting for Directors," 10 Bus. Law. 3 (April 1955). The formula for cumulating votes most effectively (assuming one vote per share) is:

$$X = \frac{Y \times N^1}{N + 1} + 1$$

X = number of shares needed to elect a given number of directors

Y = total number of voting shares

$N^1$ = number of directors desired to elect

N = total number of directors to be elected

Tabas and his "family" held only 44,062.3 shares (14.35% of 307,055) in 1979, it was mathematically impossible for Tabas to elect even a single director. As Tabas lacked "the power to elect a majority" of Lincoln's board, it is axiomatic that his continued ownership of Lincoln securities would not affect "a change of control of such institution." Our conclusion is further supported as to future election years by reason of Lincoln's classified (staggered) board of directors.[7]

Since the Department has failed to demonstrate that Tabas's ownership of Lincoln securities has or will affect a "change in control," we must conclude that enumerated conditions (2) and (3) were improperly imposed under Section 112(e) of the Banking Code.

## ORDER

The Department of Banking order, dated September 27, 1979, is hereby reversed insofar as Daniel M. Tabas's continued ownership of Lincoln securities is conditioned on (1) Lee E. Tabas shall not be employed by Lincoln National Company or Lincoln Bank as either an officer or an employee; and (2) no remuneration should be paid to Lee E. Tabas in his capacity as a director or chairman or member of any committee or the Board of Directors of Lincoln National Company or Lincoln Bank in an amount in excess of that which any other such director, chairman or member would receive for serving in a similar capacity.

---

[7] We note that corporate charters which provide for a staggered election of board members has been historically viewed as a means of preventing a corporate takeover. *See* Smith, "Fair Price & Redemption Rights: New Dimensions in Defense Charter Provisions," 4 Del. J. Corp. L. 1 (1978).

The Department order is hereby affirmed insofar as Tabas's continued ownership of Lincoln securities is subject to Departmental approval for future acquisitions of Lincoln stock.