Michael A. NUTTER, Appellant

v.

John DOUGHERTY, Dwight Evans, Chaka Fattah, Jonathan Saidel and City of Philadelphia.

Michael A. Nutter

v.

John Dougherty, Dwight Evans, Chaka Fattah, Jonathan Saidel

Appeal of: John Dougherty.

Michael A. Nutter

v.

John Dougherty, Chaka Fattah, and the City of Philadelphia.

City of Philadelphia, Appellant.

Commonwealth Court of Pennsylvania.

Argued March 7, 2007.
Decided April 2, 2007.

Susan L. Burke, Philadelphia, for designated appellant, Michael A. Nutter.

Richard G. Feder, Philadelphia, for appellant, City of Philadelphia.

George Bochetto, Philadelphia, for appellee, John Dougherty.

Gregory M. Harvey, Philadelphia, for appellee, Chaka Fattah.

BEFORE: LEADBETTER, President Judge, and COLINS, Judge, and SMITH-RIBNER, Judge, and PELLEGRINI, Judge, and FRIEDMAN, Judge, and COHN JUBELIRER, Judge, and LEAVITT, Judge.

OPINION BY Judge SMITH-RIBNER.

This matter involves consolidated appeals stemming from dismissal of the complaint filed April 12, 2006 in the Court of Common Pleas of Philadelphia County by Michael A. Nutter (former Philadelphia City Councilman) against John Dougherty, Chaka Fattah, Dwight Evans and Jonathan Saidel,[1] politicians who Nutter averred were exploring Mayoral candidacies. Nutter sought a declaration from the trial court that the named Defendants were required to abide by campaign contribution dollar limits set forth in Chapter 20–1000 of the Philadelphia Code, also known as the Philadelphia Campaign Finance Ordinance ("Ordinance"). Nutter and Intervenor City of Philadelphia appeal from the trial court's order entered on December 13, 2006 granting judgment on the pleadings in favor of the named Defendants based on the trial court's determination that the Ordinance was "unconstitutional, void and therefore unenforceable."[2]

---

**1.** Saidel was dismissed as a party on July 12, 2006, and Evans did not file a brief.

**2.** Nutter's statement of the question involved is whether the City has the power to limit the amount of campaign contributions donated to candidates running for municipal offices. The City essentially questions whether the legislature clearly expressed intent to preclude local regulation of campaign contributions to candidates for local office when the legislature has not addressed campaign contribution limits and whether an irreconcilable conflict exists between the legislature's silence with respect to campaign contribution limits and the Ordinance.

Dougherty questions whether the Ordinance is valid, whether the legislature intended to preclude local legislation in the field of campaign finance and expenditures and whether the "Resign to Run" provision in the Philadelphia Home Rule Charter (Home Rule Charter) should be interpreted and applied to allow a violator to avoid penalty provisions by resigning his City employment subsequent to the violation but before a final determination of the violation is made.

The trial court entered its order after Nutter withdrew his complaint on November 6, 2006, leaving outstanding Count II of the counterclaim filed by Dougherty, which had not been withdrawn. Previously, on September 27, 2006, the trial court sustained Nutter's preliminary objections to Count I of Dougherty's counterclaim, and Dougherty has cross-appealed that order to this Court.

I

*Background*

City Council enacted the original Ordinance on December 18, 2003 (Bill No. 030562), effective January 1, 2004, establishing a $1000 limit on the amount of campaign contributions that may be made by "persons" to candidates for Mayor and City Council and a $5000 limit on the contributions that may be made by political action committees. City Council amended the Ordinance on May 26, 2005 (Bill No. 050301–A), which the Mayor signed June 9, 2005, to impose the limit on contributions to candidates for all other City elective offices (District Attorney, City Controller, Register of Wills, Sheriff, Clerk of Quarter Sessions Court and City Commissioner), to increase the limit to $2500 on contributions made by "individuals" and to increase the limit to $10,000 on contributions made by persons other than the individuals covered under Section 20–1002(1) and by political action committees. The Ordinance was amended December 1, 2005 (Bill No. 050014) to require candidates for local elective office, treasurers of political committees and others to file campaign finance reports with the Board of Ethics.

The Ordinance was amended again on October 26, 2006 (Bill No. 060629), *inter alia,* to define a "candidate" as either "(a) [a]n individual who files nomination papers or petitions for City elective office; [or] (b)

[a]n individual who publicly announces his or her candidacy for City elective office." Section 20–1001. The Ordinance also provided that if campaign contributions from a candidate's personal resources total $250,000 or more then the limits on contributions for all other candidates for that office shall double. Section 20–1002. The Mayor signed Bill No. 060629 on November 16, 2006. *See* full text of the Ordinance attached to this Opinion as "Appendix A."

Nutter averred in his complaint that the Ordinance was enacted in response to the "pay-to-play" culture that permeated City politics to the detriment of the public and the City and that the public campaign reports filed by Dougherty, Evans and Fattah each show campaign contributions of varying amounts that were received by them in violation of the Ordinance contribution limits. Nutter also averred that City Council intended to follow the definition of "candidate" in the Pennsylvania Election Code (Election Code), Act of June 3, 1937, P.L. 1333, *as amended,* 25 P.S. §§ 2600–3591, and that, although the campaign reports do not state that they relate to the Mayoral campaign, the Defendants filed their reports with the understanding that they are candidates for purposes of campaign finance laws and have formed committees to raise funds.

In Count I Nutter sought a declaration under the Declaratory Judgments Act, 42 Pa.C.S. §§ 7531–7541, that the Defendants must abide by the campaign contribution limits. Nutter averred that an actual case and controversy existed by virtue of the Defendants' statements and conduct and that declaratory relief is warranted to ensure that Nutter's compliance with the Ordinance does not cause him harm. In Count II he sought an injunction directing the Defendants to cease soliciting and accepting illegal campaign contributions and

to return contributions that violated the Ordinance. Count III sought attorney fees. The Defendants filed answers denying, *inter alia*, that they took illegal campaign contributions or misled anyone with regard to the Ordinance. Each averred that he would comply if the Ordinance were declared constitutional. Dougherty, Fattah and Evans filed New Matter raising the preemption defense and Nutter's failure to aver facts to show that City Council intended to adopt the Election Code's definition of "candidate."

Dougherty filed a counterclaim averring in Count I that Nutter had violated Section 10–107(5) of the Philadelphia Home Rule Charter (Home Rule Charter), prohibiting any city officer or employee from being a candidate for public office unless the city officer or employee has first resigned his or her office or employment and imposing a one-year sanction against holding public office in the City for violating the provision. Dougherty sought an injunction to compel Nutter to resign his Council seat and to enjoin him from being a candidate in any City election for a period of one year. In Count II Dougherty sought a declaration that the Ordinance was unconstitutional and was preempted by the Election Code.

The trial court overruled Nutter's preliminary objections to Count II of the counterclaim, and upon consideration of the parties' supplemental pleadings, the trial court dismissed Count I of the counterclaim on September 27, 2006 as being moot because Nutter had resigned his City Council seat on July 7, 2006. Because the term for the new Mayor would begin in January 2008, the trial court reasoned that any sanction against Nutter for violating Section 10–107 of the Home Rule Charter would end by July 2007, or one year from the date he resigned his seat. The next day, on September 28, 2006, the trial court overruled the City's preliminary objections, which Nutter had joined, concluding that valid issues of law had been raised with regard to preemption; the court then invited the named Defendants to file motions for judgment on the pleadings. Because of the October 2006 amendment to the Ordinance, Nutter discontinued his action, but the matter was not ended because under Pa. R.C.P. No. 232(a) the discontinuance did not affect Dougherty's right to proceed with Count II of his counterclaim.

In its December 2006 opinion, the trial court began its analysis with reference to a fundamental principle stated by the Pennsylvania Supreme Court in *Commonwealth ex rel. Truscott v. City of Philadelphia*, 380 Pa. 367, 111 A.2d 136 (1955), that municipalities are not sovereigns and have no original or fundamental power of legislation and may enact only those ordinances authorized by the Pennsylvania Constitution or by enabling acts of the legislature. After reviewing *Truscott* in the context of constitutional and statutory limitations on the powers of City Council, the trial court determined that the Supreme Court's decision to invalidate the ordinance in that case abolishing the board of revision of taxes was premised on a fundamental precept of statutory construction evidenced by the court's reliance upon state legislation authorizing City Council to legislate with respect to abolishing only certain specified local offices. The trial court applied the Latin maxim *"expressio unius est exlusio alterius,"* translated to mean that "the mention of one thing implies the exclusion of another thing[,]" *Cali v. City of Philadelphia*, 406 Pa. 290, 308, 177 A.2d 824, 833 (1962), to conclude that the Ordinance was unconstitutional. In *Cali* the Supreme Court affirmed a final decree enjoining the City from filling a vacancy in the office of Mayor in an even-numbered year instead of an odd-numbered year as then required

by Article VIII, Section 3 of the Constitution.

The trial court explained that Sections 1621–1642 of the Election Code, 25 P.S. §§ 3241–3260b, regulate campaign contributions and expenses and provide a comprehensive scheme identifying "what are considered contributions, who may or may not make contributions, in what form the contributions shall be made, how the contributions are to be recorded and reported, and sanctions for violating Sections of the Election Code." Trial Court, December 13, 2006, slip op. at 9. It determined that none of the sections granted a municipality the local option of enacting legislation to enlarge or contradict those sections. The trial court summarized its conclusions at page 10 of its opinion as follows:

1. The Pennsylvania Legislature has enacted, through the Election Code, a comprehensive legislative scheme regulating political campaign contributions.

2. The Pennsylvania Legislature did not enact legislation delegating to municipalities the ability to enact [their] own legislation regulating political campaign contributions.

3. The Philadelphia Campaign Finance Ordinance limits political campaign contributions and is therefore an enlargement of power granted to it by the Pennsylvania Legislature and directly contradictory to a power retained by the Pennsylvania Legislature.

Based on its reasoning, the trial court entered its declaratory judgment in favor of Dougherty and Fattah and against Nutter and the City and found the Ordinance to be unconstitutional, void and unenforceable.[3]

In its January 2007 opinion addressing the parties' statements of matters complained of on appeal, the trial court explained the procedural history of this case and provided the reasons for its rulings, essentially reciting the text of its prior orders and opinions, recounting the basis for its decision to limit Intervenor status to the City for the sole purpose of addressing the validity of the Ordinance and expanding upon its reasons for dismissing Count I of Dougherty's counterclaim as moot. The trial court restated the finding in its July 12, 2006 order that the Ordinance failed to contain a definition of "candidate" and therefore on its face could not be enforced against Saidel, who was dismissed from the case. The Ordinance was amended October 26, 2006 to add a definition of "candidate."

In response to the argument that the maxim *expressio unius est exclusio alterius* was not a valid basis for the trial court

---

**3.** In *Dunn v. Board of Property Assessment, Appeals and Review of Allegheny County*, 877 A.2d 504 (Pa.Cmwlth.2005), *appeal granted in part*, 590 Pa. 620, 913 A.2d 863 (2006), this Court restated the scope of review in an appeal from dismissal of a complaint resulting from the trial court's grant of a motion for judgment on the pleadings. A motion for judgment on the pleadings may be granted only when the pleadings show that no genuine issue of fact exists and that the moving party is entitled to judgment as a matter of law. Also, the appellate court's review is plenary, and it must determine whether the trial court committed clear error of law or whether any facts were disclosed by the pleadings that should be presented to a jury. The appellate court must accept as true all well-pleaded facts as averred by the party against whom the motion for judgment on the pleadings was made and may consider only those facts specifically admitted by that party. Appellate review is confined to the pleadings and any documents or exhibits properly attached thereto, and the record must show that the moving party's case is so clear and free from doubt that a trial is unnecessary. Only then may an appellate court affirm the trial court's order. *See also Pentlong Corp. v. GLS Capital, Inc.*, 573 Pa. 34, 820 A.2d 1240 (2003).

to find a conflict between the Ordinance and state law, the trial court denied that it made a finding that the Ordinance conflicted with state law based upon the maxim. Rather, the principle the trial court relied upon was one of limitation as opposed to conflict.[4]

II

*Parties' Arguments*

(A)

Nutter argues that the trial court's December 2006 order should be reversed because the Election Code does not impliedly preempt the Ordinance. He proffers four reasons for why the Commonwealth has not impliedly preempted the City's power to respond to public corruption: the Commonwealth has not expressly reserved to itself the power to regulate municipal campaign finance; the Election Code covers disclosure of contributions rather than their limits; the state has not considered the Election Code as supplanting all other efforts to regulate campaign contributions in contrast to legislative intent expressed, for example, in gaming and ethics legislation; and the Election Code and the Ordinance do not contradict each other and can be enforced and implemented together. Specifically, the trial court erred in relying on the maxim *expressio unius est exclusio alterius* to the exclusion of the First Class City Home Rule Act (Home Rule Act), Act of April 21, 1949, P.L. 665, *as amended,* 53

P.S. §§ 13101–13157, which preserves all residual powers for the City unless and until affirmatively curtailed by the legislature.

With regard to preemption, Nutter cites the rule that courts will refrain from striking a local ordinance "unless the Commonwealth has explicitly claimed the authority itself, or unless there is such actual, material conflict between the state and local powers that only by striking down the local power can the power of the wider constituency be protected." *United Tavern Owners of Philadelphia v. School District of Philadelphia,* 441 Pa. 274, 280, 272 A.2d 868, 871 (1971). Furthermore, any ambiguity as to legislative intent is to be resolved in favor of the municipal power, *County of Delaware v. Township of Middletown,* 511 Pa. 66, 511 A.2d 811 (1986), and when conducting a preemption analysis courts must determine whether the "field or subject matter" of an ordinance, along with its effects, is the same as that of state legislation. *See Duff v. Township of Northampton,* 110 Pa.Cmwlth. 277, 532 A.2d 500 (1987), *aff'd,* 520 Pa. 79, 550 A.2d 1319 (1988).

Nutter refers to the campaign contribution limits imposed in the Public Official and Employee Ethics Act (Ethics Act), 65 Pa.C.S. §§ 1101–1113, and in the Pennsylvania Race Horse Development and Gaming Act (Gaming Act), 4 Pa.C.S. §§ 1101–1904, and he asserts that if the Election Code was intended to occupy the field and

---

**4.** In *Kuznik v. Westmoreland County Board of Commissioners,* 588 Pa. 95, 902 A.2d 476 (2006), the Supreme Court discussed the theory of "conflict preemption," which this Court found did not apply in the electronic voting machine case before it. The Supreme Court explained the theory as it applied in *Kuznik* as follows: "[S]tate law may be displaced if it is physically impossible to comply with both state and federal laws, or if the state law stands as an obstacle to the accomplishment and execution of the purposes and

objectives of Congress." *Id.* at 114, 902 A.2d at 487. *See also City Council of Bethlehem v. Marcincin,* 512 Pa. 1, 515 A.2d 1320 (1986) (restating that when an ordinance conflicts with a statute, the municipal will must be respected unless conflict between the statute and ordinance is irreconcilable). This Court agrees with the City that conflict preemption does not apply. In any event, the trial court has disclaimed any application of this theory in finding the Ordinance to be unconstitutional.

subject matter of campaign contribution limits, those limits contained in the Ethics Act and the Gaming Act would appear in the Election Code, but they do not. Moreover, courts have found entire fields of legislation to be preempted only when "the state has retained all regulatory and legislative power for itself and no local legislation is permitted." *Council of Middletown Township v. Benham,* 514 Pa. 176, 181, 523 A.2d 311, 313 (1987). *See also Hydropress Envtl. Servs., Inc. v. Township of Upper Mount Bethel,* 575 Pa. 479, 836 A.2d 912 (2003) (plurality opinion) (stating that municipalities are presumed to have the power to legislate in a field regardless of how extensively the legislature has legislated in that field).

With respect to the issue of supplementation of state law, the Supreme Court noted the following in *Western Pennsylvania Restaurant Ass'n v. City of Pittsburgh,* 366 Pa. 374, 381, 77 A.2d 616, 620 (1951) (quoting *Natural Milk Producers Ass'n v. City and County of San Francisco,* 20 Cal.2d 101, 109, 124 P.2d 25, 29 (1942), *vacated,* 317 U.S. 423, 63 S.Ct. 359, 87 L.Ed. 375 (1943)):

> [W]here the legislature has assumed to regulate a given course of conduct by prohibitory enactments, a municipal corporation with subordinate power to act in the matter may make such additional regulations in aid and furtherance of the purpose of the general law as may seem appropriate to the necessities of the particular locality and which are not in themselves unreasonable.

Nutter maintains that the Ordinance supplements the Election Code; that the Ordinance is aimed at promoting public accountability; that it does not conflict with the state's regulatory scheme; and that any differences in contribution limits among municipalities around the state pose no threat to legislative intent.

In *City of Philadelphia v. Schweiker,* 579 Pa. 591, 858 A.2d 75 (2004), the Supreme Court noted that the Home Rule Act granted the City any and all legislative powers to the same degree held by the legislature unless and until it affirmatively and expressly passed legislation to deny that power. Section 17 of the Home Rule Act, 53 P.S. § 13131, confers power in the City to exercise any and all powers relating to its municipal functions that are not inconsistent with federal or state constitutions, and an amendment to the Pennsylvania Constitution guarantees that all municipalities choosing to adopt a home rule charter "may exercise any power or perform any function not denied by this Constitution, by its home rule charter or by the General Assembly at any time." Article IX, Section 2. Nutter states that Section 17 was clarified by the Home Rule Charter and Optional Plans Law, 53 Pa. C.S. §§ 2901–3171, and that Section 2962(a)(5), 53 Pa.C.S. § 2962(a)(5), precludes municipalities from enacting laws that supersede state law pertaining to the *registration* of electors and the *conduct* of elections. Section 2961, 53 Pa.C.S. § 2961, provides in relevant part that all grants of power to home rule municipalities shall be liberally construed in their favor.

To buttress his position on the supplementation issue, Nutter notes that Section 1111 of the Ethics Act, 65 Pa.C.S. § 1111, expressly invites local legislation when it states that "[a]ny governmental body may adopt requirements to supplement this chapter, provided that no such requirements shall in any way be less restrictive than the chapter." The Ordinance supplements the Ethics Act, which restricts campaign contributions made for purposes of influence. Section 1103(b), 65 Pa.C.S. § 1103(b), provides:

> No person shall offer or give to a public official, public employee or nominee or

candidate for public office or a member of his immediate family or a business with which he is associated, anything of monetary value, including a gift, loan, political contribution, reward or promise of future employment based on the offeror's or donor's understanding that the vote, official action or judgment of the public official or public employee or nominee or candidate for public office would be influenced thereby.

(B)

The City's position is that the trial court's discussion of *Truscott* is irrelevant inasmuch as the City has been granted broad powers of local legislation pursuant to Section 17 of the Home Rule Act "to the full extent that the General Assembly may legislate...." It notes three types of preemption governing local legislation: (1) the legislature can expressly preempt local legislation regarding matters of statewide concern, *see Ortiz v. Commonwealth*, 545 Pa. 279, 681 A.2d 152 (1996); (2) when the legislature has preempted a field, "the state has retained all regulatory and legislative power for itself and no local legislation in that area is permitted," *Devlin v. City of Philadelphia*, 580 Pa. 564, 579, 862 A.2d 1234, 1242 (2004) (quoting *Hydropress*, 575 Pa. at 489, 836 A.2d at 918); and (3) municipalities cannot adopt local ordinances that conflict with state law. *See Cali*. The City reiterates that the legislature "must clearly show its intent to preempt a field in which it has legislated." *Council of Middletown*, 514 Pa. at 180, 523 A.2d at 313. Moreover, a heavy burden is on Dougherty and Fattah to prove that the Ordinance is unconstitutional because ordinances are presumed to be valid. *See Johnston v. Township of Plumcreek*, 859 A.2d 7 (Pa.Cmwlth.2004).

Further, the Election Code provisions added by Section 2 of the Act of October 4, 1978, P.L. 893, require public disclosure of campaign contributions and how and by whom they may be made. Section 1634, 25 P.S. § 3254, prohibits any anonymous contributions, contributions made via a "pass through" or contributions in cash in amounts over $100 per year; and Sections 1622–1632, 25 P.S. §§ 3242–3252, require candidates, political committees and lobbyists to maintain records of and to publicly report the sources and amounts of contributions that they receive. Also, Section 1633, 25 P.S. § 3253, prohibits entities such as banks, corporations and unincorporated associations from making political contributions or expenditures. Notwithstanding these provisions, however, the City stresses that nothing in the Election Code directly regulates the dollar amount that a lawful donor may contribute to a candidate and that the above provisions along with the Ethics Act provisions represent the state's only regulation of campaign contributions, save the more recent provisions in the Gaming Act.

The City maintains that the Ordinance represents supplementation of the kind explicitly invited by the Ethics Act and that the Ordinance is even more compatible with the Ethics Act's prohibition against influence-seeking political contributions than it is with the Election Code. The trial court cited no authority for its misinterpretation of the Ethics Act's authorization for supplemental legislation, which the trial court erroneously concluded was restricted solely to the prohibition against making contributions to influence a public official's actions. Additionally, the trial court erred in relying on *Cali* and in adopting the argument that the Ordinance conflicts with the Election Code when there is no showing that any Election Code provisions, in fact, conflict with the Ordinance.

The Committee of Seventy (Amicus Curiae), a non-profit advocacy organization

formed to promote ethics in local government, filed its brief opposing the trial court's December 2006 order finding the Ordinance to be unconstitutional. Based upon its arguments that the Ordinance reflects a valid exercise of the City's municipal power and for the reasons offered in briefs filed by the City and by the Greater Philadelphia Chamber of Commerce (Amicus Curiae), the Committee of Seventy requests the Court to reverse the order of the trial court. The Chamber of Commerce states in its brief that the absence of campaign contribution limits places undue and unfair economic pressures on local businesses who may not wish to compete with their competitors' political contributions, and it argues that the Ordinance supplements the Election Code in a manner tailored to meet the unique needs of the City. Based on its arguments and those presented by the City and Nutter and by the Committee of Seventy, the Chamber of Commerce also requests the Court to reverse the trial court's order.

### (C)

Fattah cites *Duff,* where this Court set forth a five-part test for courts to follow in determining whether local legislation is preempted. The test involves answering whether (1) the ordinance conflicts with state law because of conflicting policies or operational effect; (2) state law was intended expressly or impliedly to be exclusive in the field; (3) the subject matter requires uniformity; (4) the state scheme is so pervasive or comprehensive that it precludes coexistence of local regulation; and (5) the ordinance stands as an obstacle to accomplishing and executing full legislative purposes and objectives. Citing *Liverpool Township v. Stephens,* 900 A.2d 1030 (Pa.Cmwlth.2006), Fattah argues that a local ordinance will be preempted if the

answer is yes to any one of the *Duff* questions.

He posits that the Ordinance conflicts with the Election Code in policy and in operational effect based on the history of its passage in 1937 and based on the legislature's adoption in 1978 of the federal definition of "expenditure" in Section 301 of the Federal Election Campaign Act of 1971, 2 U.S.C. § 431, and its failure to adopt simultaneously the $1000 limit on the size of contributions to any candidate for federal office. *See* Section 1621(d)(1) of the Election Code, 25 P.S. § 3241(d)(1), defining "expenditure" as any "payment, distribution, loan or advancement of money or any valuable thing by a candidate, political committee or other person for the purpose of influencing the outcome of an election[.]" This history shows that the legislature did not intend to inject contribution limits in public elections. Citing *Truscott* and *Commonwealth ex rel. Maurer v. Witkin,* 344 Pa. 191, 25 A.2d 317 (1942), Fattah insists that the legislature's failure to invite supplementary legislation in certain parts of the Election Code while inviting supplementation in other parts implies a lack of intent to supplement in other areas.

Relying in part on *Duff,* where this Court found state preemption and precluded local legislation in the area of hunting wild game, Fattah purports to respond to the five questions based on his review of Article VII, Section 6 of the Constitution providing that all laws regulating the "holding" of elections or for the "registration" of electors shall be uniform. He also responds to the *Duff* questions based on his reading of *Kuznik v. Westmoreland County Board of Commissioners,* 588 Pa. 95, 902 A.2d 476 (2006), and *Cali* and his review of Election Code provisions. Finally, Fattah submits that any reliance by Nutter and the City upon the

Ethics Act to establish authorization for City Council's enactment of the Ordinance is misplaced. The Ethics Act governs the financial disclosure by public officials or candidates for public office of anything of monetary value, including, *inter alia*, gifts, loans and political contributions, and it represents an effort by the legislature to assure the people of the Commonwealth of the impartiality and honesty of their public officials. *See* Section 1103(b) and (c), 65 Pa.C.S. § 1103(b) and (c). The type of local supplementation contemplated under Section 1111 would involve, *e.g.*, the imposition of stricter financial disclosure requirements.

### (D)

Dougherty argues that the Ordinance is invalid because it conflicts with the Election Code. He relies upon the proposition stated in *Schweiker* that municipalities possess only those powers expressly granted to them and necessary to carry out those powers. Further, the Ordinance violates Section 18 of the Home Rule Act, 53 P.S. § 13133, which prohibits municipalities from exercising "powers contrary to, or in limitation or enlargement of, powers granted by acts of the General Assembly which are ... (b) [a]pplicable in every part of the Commonwealth." Because the Ordinance prohibits individuals and others from making campaign contributions above a certain amount otherwise allowed under the Election Code, the Ordinance is contrary to or in limitation of Election Code campaign finance laws. As explained in *Cali*, silence in the Election Code cannot be interpreted as legislative intent to allow municipalities to enact dollar limits.

He contends that the comprehensive revisions to the Election Code in 1978 evidence legislative intent to preempt the entire field of campaign finance, and he repeats the contentions made by Fattah

regarding the Federal Election Campaign Act of 1971 and the legislature's failure to adopt the uniform federal limit of $1000 on the amount of campaign contributions. In addition, the Election Code regulates the way in which public officials are elected, including expenses, whereas the Ethics Act focuses on the morality and state of mind of public officials while seeking and/or serving in office. Therefore, the Ordinance falls within the Election Code's regulation of campaign contributions as opposed to the Ethics Act's regulation of donors' intent or understanding of improper influence.

In his cross-appeal Dougherty relies upon Section 10–107(5) of the Philadelphia Home Rule Charter providing that "[n]o officer or employee of the City, except elected officers running for re-election, shall be a candidate for nomination or election to any public office unless he shall have first resigned from his then office or employment." Under Section 10–107(6), any officer or employee who violates Section 10–107(5) shall be ineligible for any office or position within the City for one year. Nutter resigned in July 2006 and is ineligible to hold office until July 2007. To run in the 2007 May primary election he must file a candidate's affidavit with his nomination petition, *see* Sections 907 and 910 of the Election Code, 25 P.S. §§ 2867 and 2870, on or before the tenth Tuesday before the May 2007 primary; however, he cannot file his affidavit truthfully attesting to the fact that he "is" eligible to serve as Mayor because he would be serving the one-year penalty. Dougherty cites *In re Petition of Cianfrani*, 467 Pa. 491, 359 A.2d 383 (1976), in which the court ruled that an affidavit filed by a candidate for ward executive committee was fatally defective and struck him from the ballot.

Another issue is whether Nutter can evade the penalty provisions by resigning

his Council seat. If Nutter's position is adopted, any person holding City office could retain his or her position while running for a different office so long as the person resigned from office one year prior to the start of the term for the new office. The one-year penalty is aimed at deterring those who might violate the "Resign to Run" provision, and it prohibits Nutter from continuing his candidacy. Courts must liberally interpret remedial legislation to effectuate its purpose. *See Gallie v. Workers' Compensation Appeal Board (Fichtel & Sachs Indus.)*, 580 Pa. 122, 859 A.2d 1286 (2004). Therefore, Count I of the counterclaim is not moot, and the trial court's dismissal order should be reversed and the case remanded.

## III

### Discussion/Analysis

### (A)

The Court begins its discussion in recognition of the fact that the City has certain inherent rights and powers. Philadelphia is a first-class city that exists as a Home Rule Municipality pursuant to the Home Rule Act. Under Article IX, Section 2 of the Constitution, the City as a home rule municipality may exercise the following rights and powers:

Municipalities shall have the right and power to frame and adopt home rule charters. Adoption, amendment or repeal of a home rule charter shall be by referendum. The General Assembly shall provide the procedure by which a home rule charter may be framed and its adoption, amendment or repeal presented to the electors. If the General Assembly does not so provide, a home rule charter or a procedure for framing and presenting a home rule charter may be presented to the electors by initiative or by the governing body of the municipality. A municipality which has a home rule charter may exercise any power or perform any function not denied by this Constitution, by its home rule charter or by the General Assembly at any time.

In *Schweiker* the Supreme Court acknowledged that the Home Rule Act granted Philadelphia general authority of local self-government that includes complete powers of legislation and administration in relation to its municipal functions as set forth in Section 17 of the Home Rule Act.

Section 17 of the Home Rule Act provides in part:

Subject to the limitations hereinafter prescribed, the city taking advantage of this act and framing and adopting or amending its charter thereunder shall have and may exercise all powers and authority of local self-government and shall have complete powers of legislation and administration in relation to its municipal functions, including the power and authority to prescribe the elective city officers, who shall be nominated and elected only in the manner provided by, and in accordance with, the provisions of the Pennsylvania Election Code and its amendments, for the nomination and election of municipal officers. The charter of any city adopted or amended in accordance with this act may provide for a form or system of municipal government and for the exercise of any and all powers relating to its municipal functions, not inconsistent with the Constitution of the United States or of this Commonwealth, to the full extent that the General Assembly may legislate in reference thereto as to cities of the first class, and with like effect, and the city may enact ordinances, rules and regulations necessary and proper for carrying into execution the foregoing powers and all other powers vested in the city by the charter it adopts or by this or any other law.

Section 18 of the Home Rule Act, provides in full text:

No city shall exercise any powers or authority beyond the city limits except such as are conferred by an act of the General Assembly, and no city shall engage in any proprietary or private business except as authorized by the General Assembly. Notwithstanding the grant of powers contained in this act, no city shall exercise powers contrary to, or in limitation or enlargement of, powers granted by acts of the General Assembly which are—

(a)Applicable to a class or classes of cities on the following subjects:

(1)Providing for the filing and collection of municipal and tax claims or liens and for the sale of real or personal property in satisfaction thereof;

(2)Providing for the exercise of the power of eminent domain and the procedure for the condemnation of property for public purposes;

(3)Providing for the assessment of damages and benefits for property taken, injured or destroyed;

(4)Providing methods for the incurring or increasing of indebtedness;

(5)Providing for the annexation or exclusion or detachment of territory;

(6)Regulating public schools;

(7)Providing for the personal registration of electors;

(8)Limiting rates and fixing subjects of taxation;

(9)Providing for the assessment of real or personal property and persons for taxation purposes.

(b)Applicable in every part of the Commonwealth.

(c)Applicable to all the cities of the Commonwealth, including, but not limited to, those acts providing for the disability compensation of police officers and firefighters.

The City adopted its Home Rule Charter on April 17, 1951, and Section 1–100 reads in relevant part as follows:

Pursuant to Section 1 of Article XV of the Constitution and the Act of the General Assembly, approved April 21, 1949, P.L. 665, of the Commonwealth of Pennsylvania, the City of Philadelphia (hereafter in this charter called "the City") shall have and may exercise all powers and authority of local self-government and shall have complete powers of legislation and administration in relation to its municipal functions, including any additional powers and authority which may hereafter be granted to it. The City shall have the power to enact ordinances and to make rules and regulations necessary and proper for carrying into execution its powers; and such ordinances, rules and regulations may be made enforceable by the imposition of fines, forfeitures and penalties not exceeding three hundred dollars and by imprisonment for a period not exceeding ninety days or by such greater fines, forfeitures and penalties and periods of imprisonment as the General Assembly of the Commonwealth of Pennsylvania may from time to time authorize.

The foregoing constitutional, statutory and Home Rule Charter provisions provide the full panoply of powers and authority that the City lawfully may exercise. In *Devlin* the Supreme Court restated as a general matter that municipalities are creatures of the state, and they possess only those powers of government that are expressly granted to them and are necessary to carry the powers into effect, citing *Schweiker*. It is also settled that home rule municipality powers essentially are determined by the Constitution and by state statute. *See, e.g.,* Article IX, Section 2 and Article XV,

Section 1 of the Constitution (repealed April 23, 1968); Sections 17 and 18 of the Home Rule Act. Further, home rule municipalities shall exercise no powers or authority beyond city limits except as conferred by the legislature and shall exercise no powers contrary to, or in limitation or enlargement of, powers granted by acts of the legislature that apply in every part of the Commonwealth. *See* Sections 18 and 18(b) of the Home Rule Act; *Schweiker.*

■ Another principle to guide the Court is that a municipality may not exercise power or authority in violation of the preemption doctrine, which provides that when the legislature has preempted a field the state has retained all regulatory and legislative power for itself and therefore prohibits local legislation in that area. *See Devlin*; *Hydropress.* In *Council of Middletown* the Supreme Court addressed the question of whether the state preempted all local zoning ordinances that dealt with sewage and sewers. The court reiterated the meaning of state preemption:

> The state is not presumed to have preempted a field merely by legislating in it. The General Assembly must clearly show its intent to preempt a field in which it has legislated. *Retail Master Bakers Association v. Allegheny County*, 400 Pa. 1, 161 A.2d 36 (1960). *See also United Tavern Owners v. Philadelphia School District*, 441 Pa. 274, 272 A.2d 868 (1971) (Opinion Announcing the Judgment of the Court). The test for preemption in this Commonwealth is well established. Either the statute must state on its face that local legislation is forbidden, or "indicate[] an intention on the part of the legislature that it should not be supplemented by municipal bodies." *Western Pennsylvania Restaurant Association v. Pittsburgh*, 366 Pa. 374, 381, 77 A.2d 616, 620 (1951). *See also Harris–Walsh, Inc. v. Dickson City Borough*, 420 Pa. 259, 216

A.2d 329 (1966). If the General Assembly has preempted a field, the state has retained all regulatory and legislative power for itself and no local legislation is permitted. *Western Pennsylvania Restaurant Association, supra.*

*Council of Middletown*, 514 Pa. at 180–181, 523 A.2d at 313.

The Supreme Court announced in *Council of Middletown* that "[t]otal preemption is the exception and not the rule." *Id.* at 184, 523 A.2d at 315. Equally as important, for purposes of this discussion, is the court's observation in *Council of Middletown* that preemption could not be implied there considering the express sharing of regulatory power conferred upon local authority and the court's observation in *Western Pennsylvania Restaurant Ass'n* that a third class of statutes "are silent as to whether municipalities are or are not permitted to enact supplementary legislation or to impinge in any manner upon the field entered upon by the state; in such cases the question whether municipal action is permissible must be determined by an analysis of the provisions of the act itself in order to ascertain the probable intention of the legislature in that regard." *Id.*, 366 Pa. at 380–381, 77 A.2d at 619–620.

### (B)

■ An analysis of case law illustrates the merit in the arguments made by Nutter and the City and shows that the trial court erred in declaring the Ordinance unconstitutional and therefore unenforceable. At the outset, the Court finds that the trial court erred in relying upon *Truscott* and *Cali* for its decision when the municipal powers invoked in those cases clearly contravened constitutional and statutory provisions. In essence, the ordinances in *Truscott* and *Cali* permitted what the Constitution and state statutes directly for-

bade, and, as a consequence, the ordinances were invalidated.

In *Truscott* the Supreme Court found that the City ordinance abolishing the board of revision of taxes violated former Article XIV, Section 8 of the Constitution (City–County Consolidation Amendment of 1951) (repealed April 23, 1968), which expressly provided that all county officers shall become officers of the City and that "until the legislature provided otherwise" they shall continue to perform their duties and be elected, appointed, compensated and organized in a manner provided by the Constitution and "the laws of the Commonwealth" in effect at the time of the amendment. To carry out Article XIV, Section 8, the legislature passed the Act of August 26, 1953, P.L. 1476, 53 P.S. §§ 3422–3426 (later classified to 53 P.S. §§ 13151, 13132 and 13152–13154), which enabled City Council to abolish certain local offices, boards and commissions. The Act authorized the City to abolish the powers and functions only of certain specified offices that did not include the board of revision of taxes, and the City's attempt to circumvent state law by enacting the local ordinance rightfully was invalidated.

The case history in *Cali* showed that Richardson Dilworth was elected Mayor of Philadelphia in the 1959 general election but resigned effective February 1962, and the City planned to elect his replacement in the 1962 November general election. To determine the issue, the Supreme Court examined the Constitution (Supreme Law), relevant statutory provisions and finally those powers and authority delegated to the City as a home rule municipality. Then Article VIII, Section 3 of the Constitution provided that all elections for city officers for regular terms of service should be held on a municipal election day in each odd-numbered year, and Article XII, Section 1 provided that elections of local officers should be held on a municipal election day except when special elections may be required to fill unexpired terms in which event such election may be held in a year other than that prescribed for an election for a regular term of service. Moreover, Section 602 of the Election Code, 25 P.S. § 2752, provided that elections for all city officers shall be held in odd-numbered years, and Article VIII, Section 7 of the Constitution required that all laws regulating the "holding" of elections or for the registration of electors shall be "uniform" throughout the state. The Supreme Court described the Election Code as lengthy and comprehensive state legislation that governed every aspect involved in "holding" elections in Pennsylvania, and it agreed that the Home Rule Charter provision allowing for a special election to fill the Mayoral vacancy in an even-numbered year was invalid because it violated a constitutional mandate as well as Section 602 of the Election Code.

### (C)

Following its decision in *Council of Middletown*, the Supreme Court more recently in *Hydropress* expounded on the preemption doctrine and observed that the court had found legislative intent to totally preempt local regulation in only three areas—alcoholic beverages, banking and anthracite strip mining. *Council of Middletown* (citing *Commonwealth v. Wilsbach Distributors, Inc.*, 513 Pa. 215, 519 A.2d 397 (1986); *City of Pittsburgh v. Allegheny Valley Bank of Pittsburgh*, 488 Pa. 544, 412 A.2d 1366 (1980); *Harris–Walsh, Inc. v. Borough of Dickson City*, 420 Pa. 259, 216 A.2d 329 (1966); and *Hilovsky Liquor License Case*, 379 Pa. 118, 108 A.2d 705 (1954)). The plurality noted in *Hydropress* that members had expressed strong reservations about extending preemption to preclude local taxation even in the bank-

ing and liquor areas. In finding that the township had authority generally to enact its ordinance for agricultural utilization or other land application of biosolids, sludge, septage or other waste material, the plurality concluded that preemption was not intended because the Solid Waste Management Act (SWMA), Act of July 7, 1980, P.L. 380, *as amended,* 35 P.S. §§ 6018.101–6018.1003, contained "no express preemptive mandate." *Id.,* 575 Pa. at 490, 836 A.2d at 918.[5]

The plurality in *Hydropress* examined the legislative purposes behind the SWMA to establish and maintain a cooperative state and local program for sewage dispos-

al, involving, for example, local government units in training of local municipal personnel, county health departments with delegated express powers of administration and enforcement, local municipalities with planning responsibilities along with permit review and comment functions and municipal solicitors with authority to initiate actions at law and in equity to restrain violations of the act. *See* Sections 102(1), 104(4), 106(a), 201, 504 and 604(b), 35 P.S. §§ 6018.102(1), 6018.104(4), 6018.106(a), 6018.201, 6018.504 and 6018.604(b). By this language, the Supreme Court found inter-governmental coordination and cooperation rather than state preemption.[6]

---

5. The Supreme Court issued a plurality opinion in *Hydropress* where three Justices voted to reverse this Court in part and to hold that the ordinance was not preempted in its entirety by the SWMA, one Justice voted to reverse because the waste processor there did not have standing to challenge validity of the ordinance and three Justices voted to find total preemption.

6. Review of appellate court decisions that have dealt with state preemption shows directly what the Supreme Court has enunciated over a course of decades in this area. Most decisions do in fact recognize that preemption is the exception rather than the norm. *See, e.g., Devlin* (holding that ordinance enacted by City Council to extend certain rights and benefits to same-sex couples meeting the definition of "life partners" was not preempted by state legislation in the area of domestic relations because the ordinance is not legislation in an area of statewide concern); *Mars Emergency Med. Servs., Inc. v. Township of Adams,* 559 Pa. 309, 740 A.2d 193 (1999) (considering whether the Emergency Medical Services Act (EMS Act), Act of July 3, 1985, P.L. 164, *as amended,* 35 P.S. §§ 6921–6938, preempted township resolution designating emergency medical services provider other than non-profit provider licensed by the Department of Health and finding that EMS Act intended for entities other than legislature and Department to be involved in effectuating purposes of the act and therefore wording of the act leads to the conclusion that legislature did not preempt local legislation); *State Ethics Commission v. Cres-*

*son,* 528 Pa. 339, 597 A.2d 1146 (1991) (holding that time limit set in Election Code for challenging nominating petitions applied to Ethics Commission's petition to set aside certain nomination petitions because of candidates' failure to file their statements of financial interests as required by Ethics Act and concluding that since Ethics Act is silent on when such petitions must be filed there is no conflict with Election Code time limit, which must apply); *Council of Middletown* (holding that Pennsylvania Sewage Facilities Act, Act of January 24, 1966, P.L. (1965) 1535, *as amended,* 35 P.S. §§ 750.1–750–20a, did not preempt ordinances regulating sewage because the legislature intended to combine state and local power into a comprehensive regulatory scheme for sewage disposal); *City Council of Bethlehem v. Marcincin,* 512 Pa. 1, 515 A.2d 1320 (1986) (reversing dismissal of municipality's declaratory judgment action and holding that ordinance limiting office of mayor to two terms was valid exercise of municipal authority and did not conflict with state statute); and *Western Pennsylvania Restaurant Ass'n* (holding that ordinance requiring license for a restaurant to operate and prohibiting sale of adulterated, unwholesome or misbranded food or drink and regulating inspection of such establishments was not preempted by state law enacted to protect public health through regulation of conduct and operation of public eating and drinking places within the state because state law placed certain functions in local authorities and it was obvious that sanitary standards and appropriate regulations for restaurants in

a large city are different from those applicable to rural areas).

Decisions by this Court finding no preemption have applied the controlling standards set by the Supreme Court as discussed in preceding cases. *See, e.g., Hartman v. City of Allentown*, 880 A.2d 737 (Pa.Cmwlth.2005) (holding that local anti-discrimination ordinance prohibiting sexual orientation and gender identity discrimination was not preempted by Pennsylvania Human Relations Act, Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§ 951–963, and that local home rule municipality reasonably acted in the exercise of its police powers, noting that the ordinance also was consistent with the Act known as the State's Hate Crime Law, 18 Pa.C.S. § 2710, defining the criminal offense of ethnic intimidation); *Wolfe v. Township of Salisbury*, 880 A.2d 62 (Pa.Cmwlth.2005) (finding that ordinance permitting hunting in township park recreation areas not preempted by the Game Law, Act of June 3, 1937, P.L. 1225, *as amended*, 34 P.S. §§ 1311.1–1311.1502, repealed by Section 7(a) of the Act of July 8, 1986, P.L. 442, because ordinance did not regulate hunting throughout township and rejecting application of five-part *Duff* test as ordinance did not conflict with state law); *Clement & Muller, Inc. v. Tax Review Board of Philadelphia*, 659 A.2d 596 (Pa.Cmwlth.1995), *aff'd*, 552 Pa. 317, 715 A.2d 397 (1998) (determining that Liquor Code, Act of April 12, 1951, P.L. 90, *as amended*, 47 P.S. §§ 1–101–10–1001, did not preclude local municipalities from enacting non-regulatory, revenue-raising measures and that the City's business privilege tax was valid exercise of taxing authority granted by legislature); *Northeastern Gas Co., Inc. v. Foster Township Zoning Hearing Board*, 149 Pa.Cmwlth. 477, 613 A.2d 606 (1992) (determining that former Act known as the Liquefied Petroleum Gas Act, Act of December 27, 1951, P.L. 1793, *as amended, formerly* 35 P.S. §§ 1321–1329, repealed by § 20(a) of the Act of June 19, 2002, P.L. 421, did not preempt local zoning ordinance that regulated bulk fuel storage as to design, construction, location, installation and operation of equipment for storage of liquefied petroleum gas because state act only prohibited local regulation that conflicted with the act); *Muehlieb v. City of Philadelphia*, 133 Pa. Cmwlth. 133, 574 A.2d 1208 (1990) (holding that Dog Law, Act of December 7, 1982, P.L. 784, *as amended*, 3 P.S. §§ 459–101–459–1205, did not prohibit local limits on number of dogs kept by an owner in her home as the local ordinance amounted to valid exercise of municipal police power and state law evidenced no legislative intent to preclude local regulation of dogs running at large and even encouraged regulation adapted to local conditions); and *Sunny Farms, Ltd. v. North Codorus Township*, 81 Pa.Cmwlth. 371, 474 A.2d 56 (1984) (holding that state regulation prohibiting dumping of solid waste within 25 feet of the perimeter property line did not preempt a local zoning ordinance imposing 500–yard setback requirement on hazardous waste dumps because the ordinance did not set specific engineering or geological standards addressed by state regulation but rather promoted and protected public health, property values and aesthetics).

Compare cases where local regulation was held to be preempted by state statute. *See, e.g., Ortiz* (holding that Philadelphia and Pittsburgh ordinances banning certain types of assault weapons within municipal boundaries were preempted by state law as the ordinances purported to regulate ownership, use, possession or transfer of certain firearms, or matters of statewide concern because ownership of firearm is constitutionally protected); *Wilsbach Distributors* (noting that no other area of state exercise of police power is more plenary than in regulation and control of use and sale of alcoholic beverages and holding that local business privilege and mercantile tax ordinance imposing tax on importing distributor of malt and brewed beverages was preempted by Liquor Code, which regulates in plenary fashion every aspect of alcoholic beverage industry through Liquor Control Board, the designated arm of enforcement); *Allegheny Valley Bank of Pittsburgh* (holding local business privilege tax ordinance taxing bank revenue was preempted by state law as applied to state banks where Banking Code of 1965, Act of November 30, 1965, P.L. 847, *as amended*, 7 P.S. §§ 101–2204, and establishment of a Department of Banking to supervise activities of state banking institutions show legislative intent to exclusively occupy state banking field); *Harris–Walsh* (holding local ordinance regulating within borough limits future mining of anthracite coal by strip mine method preempted by state law because legislature expressly retained exclusive jurisdiction over regulation of the anthracite strip mining industry through Department of Mines); and *Duff* (holding that local ordinance making it illegal to hunt or kill game through use of bow and arrow or firearm or weapon from which shot or other object is discharged with-

With the foregoing principles in mind and having examined powers conferred upon Philadelphia, as a home rule municipality, by constitutional and statutory provisions and the Home Rule Charter, the Court agrees with Nutter and the City that the Ordinance is not preempted by state law. A review of the Election Code demonstrates clearly that it contains no "express preemptive mandate." The Supreme Court has on numerous occasions explained that the Election Code is a lengthy and comprehensive piece of legislation that governs the "holding" of elections in Pennsylvania. General Election Code provisions govern, among other things, the powers and duties of the Secretary of the Commonwealth and of county boards of elections; establishment of election districts and selection of polling places; designation of which officers may be elected in municipal and in general elections; circumstances under which special elections may be held; qualifications of electors; candidates' nomination process, deadlines for filing nomination petitions and setting aside nominations; objections to nomination petitions and withdrawal of nominated candidates; form and number of official ballots; use of electronic voting systems; conduct of primary and general elections as well as the computation of votes; and penalties for violating provisions of the Election Code.

With regard to campaign contributions and expenses, the Election Code regulates, *inter alia*, the organization of political committees; the registration of political committees when they receive more than $250 in contributions; requirements for candidate and political committee reports when they receive $250 or more in contributions or expend $250 or more; filing of annual reports; disbursement of residual funds when a candidate or political committee ceases activity; and restrictions on contributions from banks, corporations or agents of donors or the disbursement of contributions made by anonymous sources (payable to the State Treasurer). Cash contributions that exceed $100 are prohibited. Also, the Secretary of the Commonwealth is authorized to engage a certified public accountant to conduct independent audits of a specified number of reports filed by candidates. *See* Sections 1622–1635 of the Election Code, 25 P.S. §§ 3242–3255.

Significantly, the Election Code delegates extensive powers and authority to county election boards, including rulemaking authority to guide voting machine custodians, elections officers and electors and power to investigate election frauds, irregularities and violations of the law and to determine the sufficiency of nomination petitions for local office candidates so long as the county election boards' acts are not inconsistent with the Election Code. It additionally delegates "concurrent" prosecutorial authority to district attorneys to prosecute Election Code violations. *See* Section 302, 25 P.S. § 2642, and Section 1642, added by Section 2 of the Act of October 4, 1978, P.L. 893, 25 P.S. § 3260b.

The Election Code contains no language to show express or implied legislative intent to legislate with respect to limits on campaign contributions to candidates for local elective office. That being determined, a thorough review of the Election Code itself demonstrates a legislative intent to establish and maintain uniform procedures for the purpose of holding fair elections and obtaining honest election returns, *Oncken v. Ewing*, 336 Pa. 43, 8 A.2d

---

in area designated as township safety zone was preempted by Game Law, which indicated legislative intent to retain exclusive control over the regulation of hunting). In these cases the legislature provided clear intent to preempt the various fields in which it has legislated.

402 (1939), and it becomes evident that this legislative scheme intended inter-governmental coordination and cooperation with local governments in accomplishing its purposes so long as the local governments' acts are not inconsistent with the statute.[7] *See Hydropress; Mars Emergency Med. Servs., Inc. v. Township of Adams,* 559 Pa. 309, 740 A.2d 193 (1999) (stating that the act there was silent as to whether local governments may enact supplemental legislation and that court must then look to the act itself to determine legislative intent with regard to local legislation). Because there is no indication of legislative intent to preempt the field of campaign finance as it relates to campaign contribution limits for local elective office, the Court concludes that the Ordinance is not preempted by state statute. Notably, all references in the Election Code to the dollar amount of campaign contributions received or the amount of expenses incurred relate solely to legislative establishment of threshold limits for public disclosure purposes.[8]

## IV

### Cross–Appeal

■■ In Dougherty's cross-appeal from the trial court's September 27, 2006 order, he argues that the trial court erred in dismissing Count I of his counterclaim because the issue raised therein is moot. The trial court concluded that there was no case or controversy because Nutter had resigned his City Council seat and would not be prohibited from serving in office if he were elected Mayor. In *Public Defender's Office of Venango County v. Venango County Court of Common Pleas,* 586 Pa. 317, 893 A.2d 1275 (2006), the Supreme Court repeated the well-settled principle that in general courts will not decide moot questions unless there is an actual case or controversy existing at all stages of the judicial or administrative process, citing *Sierra Club v. Pennsylvania Public Utili-*

---

7. The Court does not agree that the five-part *Duff* test applies to this case. The ordinance in *Duff,* which made it unlawful for persons to hunt for or to kill game through use of a bow and arrow or any firearm or weapon from which a shot or other object is discharged within a township "safety zone," directly conflicted with the Game Law. The Ordinance here was not enacted in direct conflict with a state statute, and therefore the *Duff* test is irrelevant. In any event, the Court must be guided by controlling Supreme Court precedent.

8. The Court agrees with Nutter and the City that the Ethics Act provides added support for validating the Ordinance, which supplements the purposes of the Ethics Act intended to prohibit undue or improper influence upon public officials, public employees or nominees or candidates for public office by persons offering or giving anything of monetary value with the intent to influence official action or judgment. *See* Section 1103(b). In Section 1101.1, 65 Pa.C.S. § 1101.1, the legislature stated that the Ethics Act was intended to

strengthen the "faith and confidence" of the people of the Commonwealth in their government and declared that the people had a right to know that the financial interests of their public officials or nominees or candidates for public office did not conflict with the public's trust. Contrary to opposing arguments, the invitation in the Ethics Act for supplemental regulation by any government body under Section 1111 does not restrict such supplemental regulation merely to financial disclosure requirements. *See Hartman* (noting that the local ordinance in that case also was consistent with the Act known as the State's Hate Crime Law, 18 Pa.C.S. § 2710).

In addition, the Court is not persuaded by the contention that the legislature's failure to adopt the federal campaign contribution limits somehow forecasts the legislature's intent to preempt the field of campaign finance in connection with the regulation of limits on the dollar amount of campaign contributions made to candidates for local elective office in Philadelphia. Neither Fattah nor Dougherty offered statutory or case law authority to support their positions.

*ty Commission,* 702 A.2d 1131 (Pa. Cmwlth.1996), *aff'd,* 557 Pa. 11, 731 A.2d 133 (1999). The Supreme Court summarized the mootness doctrine as follows:

> The cases presenting mootness problems involve litigants who clearly had standing to sue at the outset of the litigation. The problems arise from events occurring after the lawsuit has gotten underway—changes in the facts or in the law—which allegedly deprive the litigant of the necessary stake in the outcome. The mootness doctrine requires that an actual case or controversy must be extant at all stages of review, not merely at the time the complaint is filed.

*Public Defender's Office,* 586 Pa. at 325, 893 A.2d at 1279 (quoting *Pap's A.M. v. City of Erie,* 571 Pa. 375, 389, 812 A.2d 591, 599–600 (2002)). *See also Mistich v. Pennsylvania Board of Probation and Parole,* 863 A.2d 116 (Pa.Cmwlth.2004) (explaining that existence of case or controversy requires real and not hypothetical legal controversy and one that affects an individual in concrete manner to allow factual predicate for reasoned adjudication and with sufficiently adverse parties to sharpen issues for judicial resolution).

The trial court was correct in concluding that the issue in Count I of Dougherty's counterclaim was moot and that it therefore should be dismissed. Nutter resigned his Council seat on July 7, 2006 before all pleadings were closed and briefings concluded. The issue of Dougherty's standing to pursue his counterclaim was resolved in his favor, but because of the change in circumstances resulting from Nutter's resignation from City Council Dougherty no longer possessed the necessary stake in the outcome of the litigation. Thus no case or controversy existed at all stages of the judicial process, and Dougherty was no longer entitled to pursue his claims in Count I. Consequently, the Court must affirm the trial court's September 27, 2006

order because Count I of Dougherty's counterclaim is moot. In view of the Court's decision to reverse the trial court's December 13, 2006 order, no legal basis exists for remanding this matter to the trial court to allow Dougherty to proceed with Count II, which sought a declaration that the Ordinance was unconstitutional and also was preempted by the Election Code. Because Dougherty may not pursue Count II, it is dismissed as well.

## V

### Conclusion

After its exhaustive review of the briefs filed in this matter, including reply briefs, along with the trial court's orders and opinions, the pleadings and any attachments thereto, the Ordinance and applicable constitutional, statutory and case law principles, the Court concludes that the trial court committed an error of law by granting the motions for judgment on the pleadings. Existing law does not favor the trial court's determination that the Ordinance is "unconstitutional, void and therefore unenforceable" because it is not preempted by the Election Code.

The purpose of the Ordinance is to change the political culture extant in elections for local office by eliminating large political contributions to current or potential public officials, which the City determined has the potential to undermine the integrity of the electoral process. In *Frank v. City of Akron,* 290 F.3d 813 (6th Cir.2002), discussing *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Sixth Circuit Court of Appeals ruled that the City of Akron's home rule charter campaign finance reform amendment limiting, *inter alia,* non-cash campaign contributions to $100 for ward council members and $300 for at-large council members and the Mayor is constitutional. The court concluded that the restriction on campaign contributions "clearly achieves the signifi-

cant objective of the citizens of Akron in limiting the appearance and the reality of corruption in the form of *quid pro quo* agreements and undue political influence exercised by large contributors." *Id.,* 290 F.3d at 818. City Council sought to achieve this precise objective in passing the Ordinance.

The Constitution, the Home Rule Act and the Home Rule Charter grant the City complete powers of legislation and administration with regard to its municipal functions, except as to when the legislature has expressly or impliedly indicated its intent to assume exclusive jurisdiction over a field in which the local government has sought to regulate. Because the legislature has indicated no intent to assume exclusive jurisdiction over the field of campaign finance in connection with setting contribution limits for local elective office, the Court holds that the Ordinance is constitutional and, therefore, is enforceable. Accordingly, the Court reverses the December 13, 2006 order of the trial court granting the motions for judgment on the pleadings filed by Fattah and Dougherty.

### *ORDER*

AND NOW, this 2nd day of April, 2007, the Court reverses the December 13, 2006 order of the Court of Common Pleas of Philadelphia County granting motions for judgment on the pleadings and declaring that Chapter 20–1000 of the Philadelphia Code is unconstitutional. The Court affirms the September 27, 2006 order of the trial court dismissing Count I of the counterclaim in this matter, and for the reasons stated it also dismisses Count II.

### "Appendix A"

City of Philadelphia

(Bill No. 060629)

AN ORDINANCE

Amending and clarifying the campaign finance provisions of Chapter 20–1000 of The Philadelphia Code; in particular, defining, for purposes of the Chapter, what it means to be a "candidate" for City elective office; prohibiting the acceptance of contributions in excess of the contribution limits; prohibiting candidates from spending the amount of any contribution in excess of the contribution limits, including any excess contributions made before a person became a candidate; providing that if one candidate makes contributions of his or her own resources in excess of a specified amount to his or her own campaign, then the contribution limits for all other candidates will be increased; providing for enforcement, including the imposition of civil penalties, by the Board of Ethics; and making certain technical changes; all under certain terms and conditions.

*THE COUNCIL OF THE CITY OF PHILADELPHIA HEREBY ORDAINS:*

SECTION 1. Chapter 20–1000 of The Philadelphia Code is hereby amended to read as follows:

### CHAPTER 20–1000. [CAMPAIGN] *POLITICAL* CONTRIBUTIONS AND EXPENDITURES.

§ 20–1001. Definitions. *For purposes of this Chapter, the following definitions shall apply:*

*(1) Candidate.*

*(a) An individual who files nomination papers or petitions for City elective office;*

*(b) An individual who publicly announces his or her candidacy for City elective office.*

*(2) Candidate political committee. The one political committee used by a candidate to receive all contributions and make all expenditures as required by § 20–1003.*

*(3) City elective office.* The offices of Mayor, District Attorney, City Controller, Register of Wills, Sheriff, Clerk of Quarter Sessions, City Commissioner or City Council.

[ (2) ] *(4)* Contribution. Money, gifts, forgiveness of debts, loans, or things having a monetary value incurred or received by a candidate or his/her agent for use in advocating or influencing the election of the candidate.

[ (1) ] *(5)* Covered election. Every primary, general or special election for [Mayor, District Attorney, City Controller, Register of Wills, Sheriff, Clerk of Quarter Sessions Court, City Commissioner and City Council] *City elective office.*

(6) Election Reform Board. A nonpartisan, non-governmental entity to be created that will execute and monitor voluntary contracts for [campaign] expenditure limitations and will include representation from the League of Women Voters of Philadelphia and/or the Committee of Seventy.

*(7) Excess pre-candidacy contributions. The amount of a person or committee's pre-candidacy contributions to a particular political committee that, had the contributions been made to a candidate for elective City office, would have been in excess of the contribution limitations set forth in subsections 20–1002(1) or 20–1002(2).*

[ (3) ] *(8)* Expenditure. The payment, distribution, loan or advancement of money or any valuable thing by a candidate, political committee or other person for the purpose of influencing the outcome of a covered election.

[ (4) ] *(9)* Person. [Any actual] *An* individual, [any business] partnership, *corporation,* sole proprietorship, or other form of business organization [permitted under the laws of the Commonwealth to make political contributions].

[ (5) ] *(10)* Political Committee. Any committee, club, association, political party, or other group of persons, including the [campaign] *candidate political* committee of a candidate for office in a covered election, which receives contributions or makes expenditures for the purpose of influencing the outcome of a covered election.

*(11) Pre-candidacy contribution. A contribution made to a political committee that: (a) has been transferred to, or otherwise becomes available for expenditure by, a candidate for City elective office; and (b) was made before such candidate became a candidate.*

§ 20–1002. [Campaign] Contribution Limitations.

(1) [No] *Except as provided in subsection (6), no* individual shall make total contributions per calendar year, including contributions made to or through one or more political committees, of more than two thousand five hundred dollars ($2,500) to a candidate for [Mayor, District Attorney, City Controller, Register of Wills, Sheriff, Clerk of Quarter Sessions Court, City Commissioner or City Council] *City elective office.*

(2) [No] *Except as provided in subsection (6), no* person, other than individuals who are covered under § 20–1002(1), and no political committee shall make total contributions per calendar year of more than ten thousand dollars ($10,000) to a candidate for [Mayor, District Attorney, City Controller, Register of Wills, Sheriff, Clerk of Quarter Sessions Court, City Commissioner or City Council] *City elective office.*

(3) During those calendar years in which a covered election is not occurring, candidates shall be limited in receiving political committee contributions [to campaigns for such office] as follows:

(i) candidates for Mayor may receive political committee contributions totaling no more than two hundred fifty thousand dollars ($250,000) per year;

(ii) candidates for District Attorney and City Controller may receive political committee contributions totaling no more than one hundred thousand dollars ($100,000) per year;

(iii) candidates for City Council, Register of Wills, Sheriff, Clerk of Quarter Sessions Court and City Commissioner may receive political committee contributions totaling no more than seventy-five thousand dollars ($75,000) per year.

*(4) No candidate may spend any excess pre-candidacy contributions for the purpose of influencing the outcome of a covered election in which he or she is a candidate, nor may any candidate political committee spend any excess pre-candidacy contributions for such purpose; including, but not limited to, the purpose of paying any expenses of such candidate political committee.*

*(5) A pre-candidacy contribution made in the same calendar year that a person become a candidate shall count toward the limitations on contributions set forth in paragraphs (1) and (2).*

[ (4) ] *(6)* The limitations imposed by this Chapter shall not apply to contributions from a candidate's personal resources to the candidate's [own campaign] *candidate political committee. However, if such contributions total $250,000 or more (regardless of the time period over which such contributions are made), then the contribution limits set forth in this Section for all other candidates for that City elective office shall double.*

[ (5) ] *(7)* The limitations imposed by this subsection shall not apply to volunteer labor.

[ (6) ] *(8)* On January 1, 2008 and on January 1 every four years thereafter, the maximum amounts set forth in § 20–1002(1) and (2) shall be adjusted, as follows. On the December 15 immediately preceding the adjustment, the Finance Director shall calculate the "CPI Multiplier" by dividing the average consumer price index for Philadelphia during the then-current calendar year by the average consumer price index for Philadelphia during calendar year 2005. To determine the average consumer price index for Philadelphia, the Finance Director shall use the latest available figures for the Consumer Price Index for all urban Consumers (CPI–U) All Items Index, Philadelphia, Pennsylvania, as measured by the United States Department of Labor, Bureau of Labor Statistics. After calculating the CPI Multiplier, the Finance Director shall calculate the new maximum amounts as follows:

(i) The maximum amount for purposes of § 20–1002(1) shall equal $2,500, multiplied by the CPI Multiplier, rounded to the nearest $100.

(ii) The maximum amount for purposes of § 20–1002(2) shall equal $10,000, multiplied by the CPI Multiplier, rounded to the nearest $100.

The Finance Director shall certify the new maximum amounts in writing to the Mayor, the City Council President and Chief Clerk of Council.

*(9) No candidate for City elective office, and no political committee, shall accept any contribution which exceeds the contribution limits set forth in this Chapter.* § 20–1003. [Campaign] *Candidate Political Committee* Accounts.

A candidate for [Mayor, District Attorney, City Controller, Register of Wills, Sheriff, Clerk of Quarter Sessions Court, City Commissioner or City Council] *City*

*elective office* shall have no more than one [campaign] *political* committee and one checking account for the city office being sought, into which all contributions for such office shall be made, and out of which all [campaign] expenditures for that office shall be made. If the candidate for office maintains other political or non-political accounts for which contributions are solicited, such funds collected in these accounts shall not be used for *the purpose of influencing the outcome of a covered election* [any campaign for municipal office].

§ 20–1004. [Campaign] *Candidate* Expenditure Limitations.

(1) [Campaign] *Expenditure* Contract.

(a) Effective for the elections for District Attorney and City Controller in the year 2005, and Mayor, Register of Wills, Sheriff, Clerk of Quarter Sessions Court, City Commissioner and City Council in the year 2007 and thereafter, a candidate seeking election to any of said offices may sign a contract with the Election Reform Board to abide by limitations on [campaign] expenditures and agreeing to report his/her contributions and expenditures to the Election Reform Board to be publicly posted on a website developed by the Election Reform Board.

(b) The [campaign] *expenditure* contract for a particular covered election may be signed by an individual candidate no later than the last date upon which such individual may withdraw as an official candidate in said election.

(c) A candidate may sign [a campaign] *an expenditure* contract limiting his/her overall [campaign] expenditures as specified in § 20–1004(2).

(2) Expenditure Limitations.

A candidate who signs [a campaign] *an expenditure* contract in accordance with this Chapter shall not make expenditures per covered election in excess of the following amounts:

Mayor $2,000,000

District Attorney $500,000

City Controller $500,000

City Council $250,000

Register of Wills $250,000

Sheriff $250,000

Clerk of Quarter Sessions Court $250,000

City Commissioner $250,000

§ 20–1005. Injunctive Relief.

Any person residing in the City of Philadelphia, including the City Solicitor may bring an action for injunctive relief in any Court of competent jurisdiction to enjoin any violations of, or to compel compliance with, the provisions of this Chapter. The Court may award to a prevailing plaintiff in any such action his or her costs of litigation, including reasonable attorney's fees.

*§ 20–1006. Required Notice of Contribution Limits.*

*(1) The Board of Ethics shall, at least every six months, arrange for the publication in the three newspapers with the largest circulation in the City and in such other newspapers as the Board shall determine, of a notice setting forth the contribution limits set forth in this Chapter, together with a plain English explanation of the provisions of this Chapter and the penalties and remedies of violations. Such notice shall also appear at all times on the City's official website.*

*§ 20–1007. Penalties. A violation of this Chapter shall be punishable by a civil penalty in the amount set forth in § 20–612 (relating to violations of the Standards of Conduct and Ethics). The provisions of this Chapter shall be subject to the jurisdiction of the Board of Ethics under*

*§ 20–606, including, but not limited to, the Board's powers and duties relating to education, training, issuance of advisory opinions, receipt of complaints, investigations, referral, and adjudication.*

SECTION 2.   Effective Date; Implementation.

(1) Effective date.   This Ordinance shall take effect thirty (30) days after it becomes law.

(2) The first public notice required by § 20–1006 of The Philadelphia Code shall be published within thirty (30) days after this Ordinance takes effect.

## DISSENTING AND CONCURRING OPINION BY Judge COLINS.

I respectfully dissent to the majority's thoughtful and thorough analysis regarding preemption.   As the majority begins, the City has only such powers that the General Assembly has granted to it and which are necessary to effectuate those powers.   Further, as the majority acknowledges, Section 18 of the Home Rule Act [1] provides that the City may not "exercise powers contrary to, or in limitation or enlargement of, powers granted by acts of the General Assembly which are . . . [a]pplicable in every part of the Commonwealth."

As further explained by the majority, legislative actions of the General Assembly may limit the power of municipalities to adopt certain laws because the statutory provision either explicitly or by implication preempts a municipality's powers to adopt certain ordinances.   The majority clearly sets forth the law regarding the preemption doctrine.   However, I disagree with the majority's application of the doctrine to the City's campaign contribution ordinance.

The General Assembly made no clear or explicit statement that the Election Code preempted all local regulation of elections or campaigns.   Accordingly, the inquiry must focus on the question of whether the comprehensive statutory scheme in the Election Code reflects the intent on the part of the General Assembly to regulate the entire field of elections, including campaign finance activity.   There can be no argument that the Election Code is comprehensive with regard to the nomination process and the process of holding elections;   however, I also believe that Sections 1621–1642 of the Election Code, 25 P.S. §§ 3241–3260b, which pertain entirely to campaign finance, constitute so comprehensive a regulatory scheme, addressing every aspect of campaign finance, that the scheme itself reflects a legislative intent not to limit campaign financing as the City has attempted to do through its ordinance.

These provisions thoroughly address the entire field of issues pertaining to campaign finance: the organization of political committees, their officers, and committees and candidates' record-keeping (Section 1622, 25 P.S. § 3242);   authorization for committees' secretaries to accept contributions (Section 1623, 25 P.S. § 3243);   the filing of registration statements by political committees receiving more than $250.00 (Section 1624, 25 P.S. § 3244);   statements of lobbyists who have contributed regardless of amounts given (Section 3245, 25 P.S. § 3245);   reporting by candidates and political committees to the Secretary of the Commonwealth regarding employment, contributions, and expenditures (Section 1626, 25 P.S. § 3246);   waiver of reporting by local candidates by affi-

---

1.   First Class City Home Rule Act, Act of April 21, 1949, P.L. 665, *as amended*, 53 P.S. § 13133.

davit (where the candidate attests that he or she does not intend to receive contributions in excess of $250.00) (Section 1933, 25 P.S. § 3246); completion and submission of annual reports by candidates and political committees (Section 1627, P.S. § 3247); late contributions or expenditures exceeding $500.00 after the filing of the pre-election report (Section 1628, 25 P.S. § 3248); oaths attached to reports and consequences of impropriety of submissions (Section 1629, 25 P.S. § 3249); residual funds of candidate or political committee (Section 1630, 25 P.S. § 3250); place of filing reports and late filing fees (Sections 1631–1632, 25 P.S. §§ 3251– and 3252); contributions by banks, corporations, and unincorporated associations, agents, anonymous contributors, and cash contributions (Section 1633–1634, 25 P.S. § 3253–3254); lawful expenses (Section 1634.1, 25 P.S. § 3254.1); independent audits and audits of expense accounts (Section 1635–1636, 25 P.S. § 3255–3256); proceedings against candidates for violations of contribution and expense provisions (Section 1637, 25 P.S. § 3257); advertising (Section 1638, 25 P.S. § 3258); powers and duties of the county supervisor of elections and the Secretary of the Commonwealth (Sections 1639—1640, 25 P.S. §§ 3259—3260); reports by business entities (Section 1641, 25 P.S. § 3260a); and enforcement (Section 1642, 25 P.S. § 3260b).

After reviewing these provisions, I believe that the General Assembly intended, without explicitly so saying, that local municipalities should not regulate the manner in and degree to which interested persons may express their support for a candidate in an election. While I agree with the majority that the Election Code does reflect the General Assembly's intent to establish certain cooperation between state and local entities for the conduct of elections, I disagree with the majority's conclusion that the General Assembly's silence

on the issue of contribution limits resolves the issue of whether the City may supplement the Election Code by creating limits applicable only in the City of Philadelphia.

In this writer's opinion these comprehensive provisions provide all the support necessary to conclude that the General Assembly's decision not to mention limits is a simple, clear, and obvious reflection of its decision **not** to provide for limitations on campaign contributions.

If we were to follow the majority's conclusion, the natural consequence of this decision will be that any County or municipality with a home rule charter will adopt its own campaign financing code. This balkanization of the Election Code was clearly not intended by the General Assembly.

While the majority's opinion is well-intended, I believe its holding constitutes judicial legislation. The mere existence of a laudatory goal cannot empower the City to create its own election code——for ignoring in one instance the Constitution, albeit for a salutary purpose, can lead, in other instances, to ignoring the Constitution for nefarious reasons. Courts simply should not engage in the act of legislating in order to address evils or inequities that must be resolved by the General Assembly. Such action must only be accomplished by our system of bi-cameral legislation with the approval of the Commonwealth's chief executive.

Although the purpose of the City's ordinance——to level the playing field so that qualified candidates without equal financial backing might stand a chance to compete with candidates who have greater financial resources or supporters with such resources——may be one that would create an improved election process, I would conclude that the implied intent of the General Assembly in adopting the campaign con-

tribution and expense provisions in the Election Code was to totally preempt the regulation of campaign contributions.

I concur with the majority's resolution of the Dougherty challenge to Nutter's claims.

### DISSENTING OPINION BY Judge FRIEDMAN.

I respectfully dissent to Part IV of the majority opinion, in which the majority concludes, like the Court of Common Pleas of Philadelphia County (trial court), that, because Michael A. Nutter resigned his City Council seat and "would not be prohibited from serving in office if he were elected Mayor," the cross-appeal filed by John Dougherty is moot. (Majority op. at 61.) The majority states that, with Nutter's resignation, there is no longer a case or controversy. However, Dougherty argues that, despite Nutter's resignation, Nutter still is prohibited from serving in office if he is elected Mayor this year. Thus, there **is** a controversy, and Dougherty's cross-appeal certainly is **not** moot.

In Count I of his counterclaim, Dougherty sought an order directing that Nutter resign his City Council seat **and** enjoining Nutter from running for Mayor. Dougherty claimed that Nutter is ineligible for any City office under Section 10–107 of the Philadelphia Home Rule Charter.[1] (R.R. at 31a, Counterclaim, ¶ 15.) In its September 27, 2006, order dismissing Count I as moot, the trial court stated:

> Plaintiff Nutter resigned from his Council seat on July 7, 2006. Assuming arguendo that he had violated Section 10–107 of the Home Rule Charter prior to

this date, the sanction that could be imposed would make him ineligible to hold a public office in the City of Philadelphia for a period of one (1) year, commencing arguably on July 6, 2006 (day before resigning) to **July 5th, 2007.** Plaintiff Nutter is now an announced candidate for the office of Mayor of the City of Philadelphia. **The term of office for the new Mayor would commence in January 2008, which is well after any prohibition from holding such office would have expired.**

> Therefore, Count I of Counterclaimant Dougherty's Counterclaim is dismissed *for mootness.*

(Trial ct.'s 9/27/2006 order; Dougherty's brief, ex. A) (emphasis added).

Dougherty argues that the trial court erred in concluding that Nutter would be eligible to hold office in January 2008. Dougherty notes that to run in the May 2007 primary, Nutter is required to file a candidate's affidavit with his nomination petition on or before the tenth Tuesday before the May 2007 primary. *See* Sections 910 and 913 of the Election Code, Act of June 3, 1937, P.L. 1333, *as amended,* 25 P.S. §§ 2870 and 2873. A candidate's affidavit must state that "he **is** eligible" for the office he is seeking. 25 P.S. § 2870 (emphasis added). Moreover, "the affidavit ... necessarily speaks from the moment the oath was administered." *Nomination Petition of Cianfrani,* 467 Pa. 491, 493–94, 359 A.2d 383, 384 (1976). Dougherty contends that, because Nutter would not be eligible to hold office until July 2007, Nutter could not file a **truthful** candidate's affidavit prior to that time. I

---

1. Section 10–107(5) of the Philadelphia Home Rule Charter states that "[n]o officer or employee of the City, except elected officers running for re-election, shall be a candidate for nomination or election to any public office unless he shall have first resigned from his

then office or employment." Section 10–107(6) of the Philadelphia Home Rule Charter states that any officer or employee who violates Section 10–107(5) shall be ineligible for any office or position within the City for one year.

agree with Dougherty. *See Cianfrani* (holding that statements in a candidate's affidavit must be true when the affidavit is taken).

The majority, in affirming the trial court's dismissal of Dougherty's counterclaim based on mootness, apparently agrees with the trial court that Nutter can legally hold office in January 2008. Thus, the majority implicitly holds that the statement of eligibility in a candidate's affidavit means that, although the candidate may not be eligible for office at the time the candidate files the affidavit, the candidate will be eligible by the time he or she takes office. However, such an interpretation is contrary to *Cianfrani* and to the clear and unambiguous language of the statute. Moreover, our supreme court has stated that the "requirements of sworn affidavits are to insure the legitimacy of information crucial to the election process. Thus, the policy of the liberal reading of the Election Code cannot be distorted to emasculate those requirements necessary to assure the probity of the process." *Cianfrani,* 467 Pa. at 494, 359 A.2d at 384. Finally, if the legislature intended the words "is eligible" in Section 910 of the Election Code to mean "will be eligible," the legislature should amend the statutory provision.[2]

Accordingly, instead of concluding that the matter is moot, I would address the issue and reverse.

---

**2.** Moreover, the majority's position would allow a City officer to take advantage of his or her office while running for another office, as long as the City officer resigned a year before the start of the term of the new office. This would defeat the purpose of the resignation rule, i.e., to eliminate political patronage and the appearance of impropriety within City government.